[Civil No. 4280. Filed March 10, 1941.]

[111 Pac. (2d) 60.]

## JOSEPH ECKERT and ALBERT J. STORCH, Appellants, v. R. L. MILLER, Appellee.

Messrs. Favour, Baker & Crawford and Mr. T. J. Byrne, for Appellants.

Messrs. O'Sullivan & Morgan, for Appellee.

ROSS, J.—This is an action by R. L. Miller against Olive Wheeler and Albert J. Storch, copartners, and Joseph Eckert, to have the defendants declared trustees *ex maleficio* of a tax title to Lots 5, 6, 7, 11 and 12 in Block 8 of the Townsite of Ash Fork, Yavapai County, Arizona, and to recover rent for Lot 11 and the east seven feet of Lot 12 from tenants Wheeler and Storch.

The complaint alleges, in substance, that said tax title was procured by defendants Wheeler and Storch in violation of the fiduciary relation existing between landlord and tenant, and through wrongful refusal to

pay plaintiff his rent, with which he would have been able to redeem his property from a tax sale before it was deeded to defendants; that defendant Joseph Eckert, an employee of the Bank of Arizona, bought the certificate of purchase from the state and procured a tax title from the county treasurer in his name through an arrangement by Storch with the bank, and that he was merely a dummy of Storch; that plaintiff, soon after learning that Storch had procured tax deed for his property, as above stated, tendered Eckert $360 to cover the $351.63 he had paid on behalf of his principals for tax title and other expenditures connected therewith, and tendered to him a quitclaim deed for reconveyance of the property to plaintiff. Such offer was renewed at the time of filing the complaint and upon refusal was paid into court as a continuing tender.

The court, after taking the evidence, in which there appears no material conflicts, made findings of fact and gave judgment to plaintiff quieting his title; also directing Eckert to convey the premises to plaintiff, upon the satisfaction of the bank's loan and interest at 8 per cent per annum; and also gave judgment against Wheeler and Storch for rent of the premises from May 11, 1938.

The appeal is by Albert J. Storch and Joseph Eckert. Olive Wheeler, a partner of Storch, does not appear as an appellant for the reason, as will appear hereafter, that she had no part in procuring tax title and did not approve thereof.

The appellants contend the judgment is not supported either by the law or the evidence. We state the facts as found by the court, supplementing them where material omissions occur: The bank's only interest in the transaction is as a lender of money, and it was at the instance and procurement of Storch that

it advanced the money to buy the tax title. It knew nothing at the time of the devious conduct of Storch.

Plaintiff was the owner of said lots and had been since 1931. Like many other property owners, he had not kept the taxes paid, probably because of his inability to do so. According to the record, he is a laboring man with four motherless children to support.

In 1932 the county treasurer of Yavapai County sold said lots to the State of Arizona and issued to it a certificate of purchase for the delinquent taxes of 1931. This certificate was assigned by the county treasurer to defendant Eckert on or about July 18, 1938. On May 23 and 30, 1938, according to recitals in the tax deed, the county treasurer published notice, as required by law, Sections 73–835, 73–836, 73–837, Arizona Code 1939, that an application for a treasurer's deed to said lots had been made by Joseph Eckert and that unless redemption be had before June 28, 1938, the deed would issue to him. The statement in the deed that Eckert had made application for deed is not true in fact for he did not purchase the certificate and receive an assignment thereof from the state until July 18, 1938, some two months after the notice. It was the state that had applied for the deed.

In any event, Eckert, acting for Storch, paid all the back taxes on the premises as required by law, Section 73–817, Id., and secured the deed. At the time, he and Mrs. Wheeler, his partner, were tenants of plaintiff, carrying on a retail grocery business on Lot 11 and the east seven feet of Lot 12. The lease was dated December 11, 1937, and was for two years. It contained a provision giving the lessee the privilege of buying the premises at any time during the life of the lease for the sum of $4,000. The rent was $33 per month, payable in advance, and had been promptly

paid until May 11, 1938. On that day Storch, acting for his firm, refused to pay the rent. On March 2, 1938, plaintiff had made a deed of the premises to his sister Mrs. L. B. Schnell and the refusal to pay rent was on the ground that plaintiff was not the owner any longer. At least that was the reason at first. In fact the deed to Schnell was made as security for expected future advances by her to plaintiff. Storch knew this and paid the amount for March and April to plaintiff without question. He again, and for the same reason and other reasons, refused or neglected to pay his rent when it fell due June 11 and July 11. On the latter date his firm owed plaintiff three months' rent, or $99.

In the meantime, plaintiff, having notice that he was in danger of losing his property unless it was redeemed, imparted that fact to Storch and informed him he was depending on the rent to help liquidate the taxes. Plaintiff went to see the county treasurer and the clerk of the board of supervisors to ascertain if they could tell him just when he must redeem or lose his property. These officers, of course, could only direct his attention to the law, but the county treasurer stated the property probably would not be taken for taxes before August 1, 1938.

On Saturday, July 16, plaintiff went to the store of Wheeler and Storch and asked Storch for the overdue rent. He said to Storch: "I must pay on the taxes and I must pay it before the first of August or I am standing a chance of losing my property." Storch told plaintiff "he did not have the money right then but that he would pay it Monday." The plaintiff informed Storch he had to go back to Phoenix Sunday evening and the latter then said he would pay the rent Monday to the plaintiff's son Harold, who had theretofore been collecting the rent for his father. When on Monday, the 18th, Harold went to Storch

for the rent the latter told him he could not pay it; that he would settle with his Dad. On that date it was that Storch went to Prescott and made the arrangements to get the tax title for himself. Out of his own funds or the funds of the partnership he paid part of the taxes and borrowed from the bank the rest.

He has not attorned to plaintiff for any of the rent since May, 1938.

It should be explained why Mrs. Wheeler is not a party to this appeal. She disapproved of her partner's action in trying to obtain plaintiff's property and said she would have nothing to do with it; stated that she had protested Storch's actions. She was not only a partner in the business with Storch but she was his mother-in-law also. That fact she did not let dull her sense of justice and right. She might have had a double motive to act with Storch: (1) that of personal gain and (2) harmony in the family circle. But, to her glory, she said, in so many words "Get thee behind me, Satan" (Mat. 16:23; Mar. 8:33, Lu. 4:8).

We now turn to the law of the case. The appellants insist that there exists no fiduciary relation between the landlord and tenant and that therefore the contention on the part of the appellee that appellant Storch violated his duty when he failed to pay the taxes is not correct. It may be granted that the appellants are correct in this contention. The rule is stated in 35 Corpus Juris 1246, section 602, as follows:

"A tenant cannot acquire a title as against his landlord by a purchase of the premises at a tax sale where the duty to pay the taxes for which the premises were sold devolved upon the tenant either by statute or by an agreement; and this is so, although the lessor may have assigned the leasehold before the tax sale, and a tenant will be held to hold the tax title so purchased as a trustee of his landlord. Furthermore, a

tenant so obligated to one having a life interest cannot set up such a title against a remainderman. But where the tenant is under no obligation to pay the taxes, it has been held that he may purchase at a tax sale and set up the title against his landlord, although in several states the contrary rule is established. . . . ''

■■ An examination of the cases leads us to believe that the better rule is that there is no duty on the part of the tenant to pay the taxes on leased premises unless the lease itself provides that he do so. We therefore conclude the law does permit a tenant to buy his landlord's title at a tax sale and the law will protect him if he has not been guilty of any unconscientious action towards his landlord or has not contributed to his landlord's inability to pay his taxes by purposely refusing or neglecting to pay his rent.

■ If there is one question that is firmly settled it is that a tenant cannot, so long as he stays in possession of the leased premises, attorn to a stranger. He must pay his rent to the person from whom he leased and under whom he got possession. There are some exceptions to this rule but none of them is present in this case. The title and ownership remained the same from the beginning of the lease, at least up to the time that Eckert bought the tax title. The defendant Storch knew this. · His excuse for neglecting and refusing to· pay the rent, because of the Schnell deed, was evidently a mere pretext.

''The attornment of a tenant to a stranger is, as a general rule, void unless it be made with the consent of the landlord, or pursuant to or in consequence of the judgment of a court of law or the order or decree of a court of equity, and will not enable the tenant to set up the title of such third person, in opposition to the title of his landlord. So where a tenant wrongfully attorns to a third person it is ineffectual in itself to render the continued possession adverse to the landlord, or to affect the continuity of the landlord's

possession. . . . '' 16 R. C. L. 654, sec. 142. See, also, 35 C. J. 1247, sec. 604.

The defendants, however, did not pay or offer to pay the rent to Schnell and Schnell did not ask them to. They, or, rather, Storch, took the position that a defaulting taxpayer lost all right in and to his property and that the tenant thereof, although originally estopped to deny his title, was relieved from such estoppel once the landlord failed to pay his taxes. Storch, instead of hastening to pay the rent he owed plaintiff so that the latter could save his property, hastened to the county seat and got the property for himself.

█ As before indicated, the courts are divided as to whether the tenant owes any duty to pay his landlord's taxes in the absence of an agreement to do so, but we are quite certain that no court has held, or will hold, that a tenant can, on promises—never intended to be kept—to pay his overdue rent, lull the landlord into a feeling of security and then take advantage of his dupe to obtain the property for himself. Storch did not speak it out to plaintiff but, judging by his conduct, he said to himself: ''I will 'jolly' Miller along and, before he can act for his own protection, I will pay the taxes and get the property, leaving him 'holding the bag.' '' We can all agree, regardless of the relation of landlord and tenant, that such conduct is very unethical and immoral. But, did it amount to actionable fraud? It is said:

''The term 'fraud' is used in various senses, and fraud assumes so many different degrees and forms that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily on the conscience and judgment of the court or jury in determining its presence or absence. In fact, the fertility of man's invention in devising new schemes of fraud is so great that

courts have always declined to define it, reserving to themselves the liberty to deal with it under whatever form it may present itself. . . .

" . . . There seems to be but little difference between bad faith and fraud in this particular relation. Fraud may be said to be an action of a more affirmative evil nature, such as proceeding or acting dishonestly, intentionally, and deliberately, with a wicked motive, to cheat or deceive one party to a transaction with respect to the situation or operations, or such as one which results to his damage or loss and to the advantage or gain of the other party." 23 Am. Jur. 753, sec. 2.

 We think the facts disclose that Eckert was *ex maleficio* trustee of the title to said property, for the use and benefit of the plaintiff. In *MacRae* v. *MacRae,* 37 Ariz. 307, 294 Pac. 280, 282, is this definition of a constructive trust:

"A constructive trust is one which does not arise by agreement or from the intention of the parties, but by operation of law, and fraud, actual or constructive, is an essential element thereto. Actual fraud is not always necessary, but such a trust will arise whenever [the circumstances under which the property was acquired make it inequitable that it should be retained by the one who holds the legal title.] These trusts are also known as trusts *ex maleficio* or trusts *ex delicto.* Their form and varieties are practically without limit, as they are raised by courts of equity whenever it becomes necessary under the particular circumstances of the case to prevent a failure of justice, but the element of fraud, either actual or implied, must always be present."

Pomeroy, in his work on Equity Jurisprudence, 3d Ed., Volume 3, section 1053, says:

"In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which

render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrong-doer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust. The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto,* are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrong-doer.''

We think justice was done by the judgment of the lower court, and it is therefore affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.