292 P.2d 455

**Emma HONK, Appellant,**
**v.**
**Karl Fritiof KARLSSON, Adolph Natanael Karlsson and Nils Karlsson,**
**Appellees.**
**No. 5952.**

Supreme Court of Arizona.
Jan. 17, 1956.

Rehearing Denied Feb. 15, 1956.

Leonard S. Sharman, Phoenix, for appellant.

Phillips, Jones & Phillips, Phoenix, for appellees.

UDALL, Justice.

This is an appeal from a judgment in favor of plaintiffs in an equitable action brought by them against defendants Emma Honk, et al., to impress a constructive trust in plaintiffs' favor upon certain property which had been distributed by a decree of distribution in the matter of the estate of David Swanson (otherwise known as David Svenssen), deceased. The gravamen of said action is that the decree of distribution was procured by means of certain alleged fraudulent acts and conduct on the part of defendant Emma Honk during the course of probate of said estate.

The main point urged for a reversal is that the evidence adduced does not support the judgment.

From the record it appears that David Swanson, who originally came from Sweden, was a resident of Phoenix, where he died intestate on February 23, 1948, leaving an estate in Maricopa County, Arizona. Emma Honk (defendant-appellant), an aged cousin of decedent living in Portland, Oregon, upon learning of his death nominated Attorney Harold J. Janson, of Phoenix, to act as administrator of said estate. This attorney started the probate proceedings but died shortly thereafter. Mrs. Honk then nominated Attorney James

J. Cox, Jr. of Phoenix to act as administrator de bonis non. Neither of the petitions for letters were signed by defendant Honk. The probate court, however, honored both nominations and the attorneys named were appointed administrators and proceeded to administer said estate. It is conceded that all the pertinent provisions of the probate code were meticulously followed. A final decree of distribution was entered on November 23, 1949, wherein it is recited that decedent left surviving him as his sole heirs at law: Emma Honk, a cousin, aged 72 years, of Portland, Oregon; and Charles Nelsson, a cousin, aged 70 years, residing in Sweden. All of said estate was ordered distributed to them, each to receive an undivided one-half interest.

On June 18, 1952, Karl Fritiof Karlsson, Adolph Natanael Karlsson and Nils Karlsson as plaintiffs (now appellees) commenced this equitable class action in the superior court against Emma Honk and Adolph Nelsson, defendants. (Adolph Nelsson is a son and sole heir of Charles Nelsson, now deceased, one of the original distributees. At the trial of the present case he consented that judgment be entered in favor of the plaintiffs in declaring a trust to exist as to any interest in the property then held by him as an heir of David Swanson.) The complaint alleges that plaintiffs and a goodly number of others (47 in all) are heirs at law—on the paternal side—of David Swanson, and have some right, title, claim or interest in and to the property therein described—which originally belonged to decedent. It is specifically alleged:

"That the claim of defendant Emma Honk is either the result of mistake or is fraudulent and based upon deceit and misrepresentation in that said defendant represented to the personal representative of the estate of said deceased that she was one of the sole two heirs at law of said deceased."

The defendants first filed a motion to dismiss upon the grounds that the complaint failed to state a claim upon which relief could be granted. This motion was denied and later by her answer Emma Honk again attacked the sufficiency of the complaint to state a claim for relief; challenged the jurisdiction of the court; urged estoppel and that this is a collateral attack upon the decree of distribution; pleaded said decree as a bar on the ground that the matter is now res judicata; and specifically denied the allegations as to her deceit or misrepresentations.

The matter came on for trial before the court sitting without a jury, and thereafter judgment was entered on April 20, 1954, in favor of the plaintiffs, decreeing inter alia that defendant Emma Honk was a trustee as to said property for the benefit of plaintiffs and all those other (unnamed) heirs of decedent. Findings of fact not having been requested by either party none were made, but there is a general recitation in the judgment " * * * that all of the material allegations of plaintiffs' complaint have been

sustained * * *." This appeal by Emma Honk followed.

There are a number of assignments of error. It is asserted that the complaint failed to state a claim for relief; that the court erred in not granting her motion to dismiss for the reason that the decree of distribution entered in the probate court, not having been appealed from, was conclusive and is now res judicata; the statute of limitations is urged and also laches on the part of plaintiffs; and finally, a claim that the evidence does not support the judgment.

At the outset it should be noted that neither in the trial court nor on appeal was the proposition advanced or argued that a mere mistake possibly resulting in an unjust enrichment of defendant at the expense of plaintiffs—standing alone—warranted imposition of a constructive trust. Hence there is no legal justification for us to discuss that matter here.

We are convinced the trial court ruled correctly in denying defendants' motion to dismiss the complaint, because this complaint, which seeks to establish a constructive trust upon the theory of deceit and misrepresentation or a mistake amounting to constructive fraud, is drawn upon a sound legal theory. If the decree was procured by extrinsic fraud, then equity will do justice by declaring that the distributees hold the property in trust for the rightful owners.

"It may be stated as a general rule that where the action of the successful party in probate proceedings, in concealing or failing to disclose to the court the existence of a person interested in the estate, amounts to fraud of any kind, and the defrauded person has thereby been prevented from learning of the proceeding or asserting his claim therein, *the fraud is extrinsic,* rather than intrinsic, *and such person is entitled to equitable relief against the decree of the probate court.*" Anno.—Probate Proceedings—Extrinsic Fraud. 113 A.L.R. 1235. (Emphasis supplied.)

See also: Banc.Prob.Prac.2d, Vol. 5, Sec. 1177; Trusts and Trustees, Bogert, Vol. 3, part 1, Sec. 477, p. 46; Hewett v. Linstead, 49 Cal.App.2d 607, 122 P.2d 352; Francon v. Cox, 38 Wash.2d 530, 231 P.2d 265; Hewitt v. Hewitt, 9 Cir., 17 F.2d 716. As is pointed out in Caldwell v. Taylor, 218 Cal. 471, 23 P.2d 758, 759, 88 A.L.R. 1194:

" * * * Since the probate of a will is a matter exclusively within the jurisdiction of the probate court equity may not set aside the probate, but it may declare the beneficiary a trustee for those who have been defrauded. * * *"

It is a fundamental principle of equity that no one can take advantage of his own

34

wrong. See, Butterfield v. Nogales Copper Co., 9 Ariz. 212, 217, 80 P. 345. As is stated in 89 C.J.S., Trusts, § 139 a.:

"* * * So, the doctrine of constructive trust is an instrument of equity for the maintenance of justice, good faith, and good conscience, resting on a sound public policy requiring that the law should not become *the instrument of designing persons to be used for the purpose of fraud.* * * *" (Emphasis supplied.)

■ In the case of MacRae v. MacRae, 37 Ariz. 307, 312, 294 P. 280, 282, this court laid down a definition of a constructive trust which has often been cited in subsequent decisions, to wit:

"A constructive trust is one which does not arise by agreement or from the intention of the parties, but by operation of law, and fraud, actual or constructive, is an essential element thereto. Actual fraud is not always necessary, but such a trust will arise whenever the circumstances under which the property was acquired make it inequitable that it should be retained by the one who holds the legal title. These trusts are also known as trusts *ex maleficio* or trusts *ex delicto*. Their forms and varieties are practically without limit, as they are raised by courts of equity whenever it becomes necessary under the particular circumstances of the case to prevent a failure of justice, but the element of

fraud, either actual or implied, must always be present."

In other words the courts hold that where the evidence shows the prevailing party, by some extrinsic or collateral fraud, has imposed upon the court by preventing a fair submission of the controversy a constructive trust will be declared. "Extrinsic fraud" may consist in deception practiced by the successful party in purposely keeping his opponent in ignorance of the proceedings so that an appearance will not be made in court. See, Zaremba v. Woods, 17 Cal.App.2d 309, 61 P.2d 976, 981.

The California courts have extensively dealt with this matter of a constructive trust after a final decree of distribution. The case of Hewett v. Linstead, supra, was an action to impress a trust on property distributed to heirs on the ground that the decree of distribution was procured through mistake and extrinsic fraud. The District Court of Appeal, in reversing the imposition of a trust, held first that where, as here, the distributees were innocent of any wrongdoing, the excluded heirs could not successfully impose a trust on the ground of "mistake" even though a provision of the California Civil Code, section 2224, expressly named mistake as a ground for imposition of an involuntary trust. Secondly, the court laid down this rule [49 Cal.App. 2d 607, 122 P.2d 355]:

"* * * where a legatee knows of the existence of other heirs, and, for the purpose of defrauding such heirs

and benefiting himself, fails to notify the court of the existence of such heirs, and knowingly files false petitions with the court representing there are no such heirs, he is guilty of extrinsic fraud warranting the imposition of a trust on the fraudulent distributee's interest."

The rule was succinctly summarized in the case of Federal Farm Mortgage Corporation v. Sandberg, Cal.App., 209 P.2d 58, 62, affirmed 35 Cal.2d 1, 215 P.2d 721:

"* * * in order to secure relief in equity for fraud or mistake in the making of a decree of distribution, the claimant or the purported distributee must have been kept in ignorance of his rights by some act of the person to whom distribution was made." Cf. Thayer v. Fish, 49 Cal.App.2d 618, 122 P.2d 358; Rosenbaum v. Tobias' Estate, 55 Cal.App.2d 39, 130 P.2d 215.

We are in accord with these holdings of the California courts. It seems to us this rule best allows a court of equity to administer justice in such a case without an unwarranted weakening of the finality of a probate decree of distribution.

With the above rule in mind, to complete a disposition of this appeal, we need only consider the following assignment:

"5. The lower Court erred in awarding judgment to the plaintiffs and declaring the defendants to be trustees of the property in question for the benefit of plaintiffs, for the reason that the evidence did not substantiate the invocation of a constructive trust by the Court, there being no evidence of extrinsic fraud."

The evidence, which is uncontradicted, comes either from the lips of defendant Emma Honk and her husband Karl Honk, or from statements in writing which were admitted as exhibits in the case. Briefly, here is what the record shows:

1. In nominating Harold J. Janson to be appointed as administrator, defendant stated under oath, inter alia:

"I, Emma Honk, am the only surviving heir of David Swanson, deceased, residing in the United States of America; I am a cousin of said deceased * * *."

2. Later in nominating Mr. Cox to be administrator d. b. n., exactly these same words were used. In an accompanying letter, dated December 15, 1948, addressed to Attorney Cox, this statement appears:

"Wish to advise you that I do not know the relatives of David Swanson on his father's side. I am the only relative in the United States on his mother's side. I have a brother Carl Nelson, Hogboda, Box 3, Sweden, and we are the only cousins of David Swanson on his mother's side."

3. Attorney Janson was also nominated by defendant to be administrator of the estate of Mari Swanson, deceased (wife of David Swanson, who had predeceased

him); in this document Emma Honk stated that there were no children as the issue of that marriage and reiterated what is shown above.

4. The deposition of Emma Honk, the 81-year-old defendant, was taken in Portland, Oregon, and it therein appears she came to this country from her native Sweden in 1893, was married to Karl Honk in 1903 in San Francisco, and had lived in Portland since 1908; David Swanson was her cousin and she had personally known him since 1908; Swanson's immediate family, viz.: wife, brothers and sisters were all deceased; decedent had never talked to her about his family and she had never asked about them, " * * * I don't think he knew anything about his family because he never talked about them, and I don't believe there was anybody wrote a line to him"; decedent had lived in their house in Portland for a time and later lived in that area but only occasionally had they visited together; she had never heard of plaintiffs before this suit was filed, " * * * but I don't know Swansons on the father's side because I went away from there (Sweden) when I was young."

5. Karl Honk, aged husband of Emma Honk, testified that he had handled many of the business matters relative to decedent's estate and held a power of attorney from Emma. His evidence was substantially the same as that of his wife. Particularly was this true as to lack of knowledge of decedent's paternal relatives. He further testified that while he had made no independent search to locate other heirs, in the month of March, 1948 he had called on Axel Wide, the Swedish Vice-Consul in Portland, and:

"I told Mr. Wide that I had been down to Arizona and buried David Swanson, who was supposed to be the cousin of my wife, and we didn't know of any more relatives of Karl Nelsson in Sweden, and my wife, Emma Honk, and we want to know if he can find out any more relatives."

The Vice-Consul informed him that the matter was outside his jurisdiction but he would refer it to the Swedish Consul General in San Francisco; it was not until sometime after the estate had been distributed that he learned there were other heirs claiming an interest in this estate.

6. The only witness called by plaintiffs was Manne Lindholm of San Francisco, Consul General of Sweden (for the area embracing Arizona), who admitted that his predecessor had been informed by the Portland Vice-Consul of the death of David Swanson and that Mr. Honk

" * * * had told Mr. Wide that Mrs. Honk and her brother in Sweden, Charles Nelsson, were heirs, *but it was likely that there were also other heirs.*" (Emphasis supplied.)

Official correspondence addressed to defendant from that office under date of May 10, 1950, further confirmed that the con-

sulate was apprised of this fact as early as April of 1948.

7. Powers of attorney, given by the three plaintiffs and six other Swedish heirs to Manne Lindholm, Consul General, were admitted in evidence; these were executed and dated in the months of December, 1948, and January, 1949, while the decree of distribution was not entered until November 23, 1949; yet no action was taken to claim an interest in this estate until the complaint to establish a trust was filed in the instant action on June 18, 1952.

8. James J. Cox, Jr., the administrator d. b. n., testified relative to his correspondence with defendant Emma Honk and stated that the only investigation he made as to the heirs at law of decedent prior to filing petition for distribution, was to talk to Karl Honk and inquire of some people in Maricopa County. Apparently it was not until July 1951 that either Attorney Cox or the Honks learned that there were other heirs claiming an interest in the estate.

■ In considering the sufficiency of this evidence, we must be mindful of the yardsticks previously laid down in many Arizona cases relative to the quantum of proof necessary to establish fraud. In Eckert v. Miller, 57 Ariz. 94, 101, 111 P.2d 60, we discussed the nature of fraud and recognized there was in that case sufficient fraud to call into play the trust remedy. In Tucson Title Ins. Co. v. State Tax Comm., 59 Ariz. 334, 338, 127 P.2d 341, 342, this court refused to invoke a constructive trust under the facts of the case, saying:

"* * * Nowhere is it pointed out to us where any fraud existed, and as we have said [in the MacRae case] *in order to establish a constructive trust, fraud of some kind must be found in the transaction."* (Emphasis and insert supplied.)

In Brazee v. Morris, 68 Ariz. 224, 204 P.2d 475, we spelled out the difference between actual and constructive fraud, and the quantum of proof necessary to establish each type. Therein we cited Rice v. Tissaw, 57 Ariz. 230, 112 P.2d 866, 869, to the effect that:

"Fraud is never presumed. Nor can it be found to exist on a mere suspicion as to the possibilities thereof. [Citing cases.] It must be established by clear and convincing evidence. * * *"

The test applicable to the sufficiency of evidence to establish fraud was further delineated in the case of In re McDonnell's Estate, 65 Ariz. 248, 253, 179 P.2d 238, 241, to wit:

"Fraud may never be established by doubtful, vague, speculative, or inconclusive evidence, and always the proof must be sufficient to overcome the initial presumption in favor of honesty. * * *"

■ Applying these legal principles to the undisputed evidence heretofore summarized we are unable to find in this rec-

ord a scintilla of evidence of deceit or misrepresentation on the part of defendant or her husband, Karl Honk, who acted as her agent in their dealings with the personal representatives of the estate—and concededly neither had any direct dealings with the probate court. On the contrary it indubitably appears that both the defendant and her husband acted in good faith and were open and aboveboard in calling to the attention of both the administrator and the Swedish Consul General that while they knew of no other heirs of decedent there might well be some. It should be noted that Emma Honk was not the administrator, hence she did not occupy a fiduciary or confidential relationship to the plaintiffs, nor did she have any legal duty to personally search for heirs in Sweden or elsewhere. Any lack of diligence on the part of the Swedish Consul or the administrator of this estate in searching out other heirs or apprising the court there might be some is not chargeable to defendant.

No extrinsic or collateral fraud on the part of the defendant having been shown, the judgment declaring a constructive trust cannot stand.

Judgment reversed with directions to enter judgment for defendant.

LA PRADE, C. J., and PHELPS, J., concur.

WINDES, Justice (dissenting).

Judge STRUCKMEYER and I are unable to agree with the majority decision for two reasons: First, the majority err in holding that the defendant Emma Honk is not guilty of wrongful conduct amounting to extrinsic fraud; and second, we believe the majority further err in holding that no relief may be granted when one person by reason of an admitted mistake of fact secures the property of another and is unjustly enriched thereby.

The facts are neither disputed nor complicated. David Swanson died, leaving certain real property. There survived him as heirs the plaintiffs, the defendant-appellant Emma Honk and one Charles Nelsson. The defendant Emma Honk by nomination caused the appointment of an administrator who died before the estate was closed and then by nomination caused Attorney James Cox to be appointed administrator to complete the probate. Karl Honk, husband of Emma Honk, had power of attorney from his wife to handle the estate. The husband, not knowing who were the other heirs, contacted the Swedish consul and requested him to find out if there were other relatives. When Mr. Cox assumed his duties as administrator, he inquired of Mr. Honk and wrote Mrs. Honk making inquiry as to who were the heirs. Mrs. Honk advised him that she did not know decedent's relatives on the father's side but that she was the only relative on the mother's side in the United States. Mr. Honk's information to the administrator was to the same effect. Neither of them ever informed the court or the administrator that the Swedish consul was attempting to discover the exist-

ence and identity of other heirs. Cox petitioned the probate court to distribute the estate to Mrs. Honk and Nelsson as sole heirs and there being nothing to indicate other heirs, the property was so distributed. At this time, the Swedish consul had discovered nine other heirs in Sweden and secured their powers of attorney to protect their interests.

On May 10, 1950, less than six months after the estate had been distributed to defendant and Nelsson as sole heirs, the Swedish consul wrote Mrs. Honk as follows:

"You will perhaps recall that in April 1948 your husband called at the office of the Swedish Vice Consulate in Portland concerning the estate of your deceased cousin David Swanson, late of Phoenix, Arizona. It has not as yet been possible to settle this estate due to lack of information about all of the heirs. According to a proof of kinship received from Sweden the next of kin are cousins.

" * * * I assure you that any information you will be able to give concerning your above named relatives will be of great help in having this estate settled, and I trust you will please favor me with a reply in an early mail. * * *"

To this letter Mrs. Honk through her Oregon attorneys replied:

"Your letter of May 10th, file R 7 s/377, addressed to Mrs. Emma Honk,

has been referred to the undersigned for attention.

"Please be advised that Mrs. Honk's brothers and sister named in your letter are all deceased and had been unmarried. Johan Jonasson named in your letter, died in Portland, Oregon, about 1925 and was unmarried.

"We trust that this information fully answers your communication."

It will be observed that there was no hint in this reply that the estate had been closed.

Upon the death of an intestate the title to real property immediately vests in the heirs. In re McDonnell's Estate, 65 Ariz. 248, 179 P.2d 238. Consequently, when the estate was distributed, the effect of the decree was to divest the title of the rightful owners and give it to persons who had neither legal nor moral claim thereto. That this is wrong goes without saying. Our problem is whether the court of equity can and should correct such a wrong.

It has been well stated that:

" 'There is no written law placing a limit upon the power of equity to remedy and redress wrongs, neither is there any want of power in that regard in the written law. It is the crowning merit of our system that, so far as power is concerned, it is as limitless as the capacity of man to wrong a fellow man.' " Laun v. Kipp, 155 Wis. 347, 145 N.W. 183, 5 A.L.R. 655, quoted in Hewitt v. Hewitt, 9 Cir., 17 F.2d 716, 718.

40

The plaintiffs sue in equity alleging in the alternative that the wrongful taking by the defendant of plaintiffs' property was caused either through mistake or fraud and asks that defendant be declared to hold plaintiffs' property in trust for them. The majority decision is that a court of equity cannot grant relief for mistake in the absence of extrinsic fraud on the part of those benefiting by the mistake and that the foregoing facts do not amount to fraud.

We believe the majority erroneously holds that defendant's conduct was not fraudulent. In fact, her conduct was such as amounted to an extrinsic fraud on the plaintiffs.

Mrs. Honk, knowing the consul was laboring under the impression the estate was still not settled, deliberately suppressed the fact that the estate was closed. She, through her attorneys, gave the consul useless information concerning heirs instead of advising him the estate was closed and that he needed no further information. Had she advised him, as she should have, that distribution had already been made, ample time remained for application under the provisions of Rule 60(b), Rules of Civil Procedure, section 21-1502, A.C.A.1939, to secure relief for surprise or excusable neglect by setting aside the decree of distribution. No court would deny relief under such circumstances. By thus keeping him in the dark and impliedly representing that the estate was still pending, the six-month period for securing relief under said section 21-1502 expired and plaintiffs were thereby deprived of an opportunity to be heard. As stated in the majority opinion and under all the authorities, conduct which operates to prevent one from appearing in court within the time allowed for appearance is extrinsic fraud.

In addition to the foregoing deceitful conduct, Mrs. Honk advised the administrator nominated by her that she did not know the relatives on the father's side. She turned the matter over to the Swedish consul with the request he investigate in order that they might learn who were the relatives. Before this investigation was completed, when the administrator requested information concerning other heirs, he was not informed of the pending investigation by the consul. The estate was closed and she took plaintiffs' property apparently without even making inquiry of the result of the consul's efforts. Had inquiry been made, it would have shown that he had discovered nine other heirs but had not completed his mission and was not ready to close the estate. If the Honks wanted to be honest, they would have either sought the result of the consul's inquiries or advised the administrator in order that he might have secured the information. They "jumped the gun" and took distribution of property belonging to others without effort to discover the results of the consul's search which they instigated, and without advising either the administrator or the court of the possibility of the existence of plaintiffs.

Because of defendant's silent conduct, it was untruthfully represented to the court that defendant and Charles Nelsson were the sole heirs and defendant was given plaintiffs' property. Had the court been advised that the consul was working on the problem of discovering heirs, it certainly would never had made this erroneous distribution.

Had Mrs. Honk upon inquiry by the administrator expressly represented she and Nelsson were the only heirs, no one could well say she was not guilty of a fraudulent misrepresentation. She is legally in the same position when upon inquiry she concealed from the administrator information which would lead to the discovery of heirs. There is no distinction between the giving of false information and the failure to give correct information. Hewitt v. Hewitt, 9 Cir., 17 F.2d 716.

When inquiry was made of her and her attorney in fact, they failed to disclose this important fact of the consul's investigation. She also failed to inform the consul the estate was closed. Under such circumstances, one's duty is to make a full disclosure of all important facts concerning the matter. A partial statement of the truth is as fraudulent as a misstatement of the truth. 23 Am.Jur., Fraud and Deceit, section 83, page 861; 37 C.J.S., Fraud, § 16(c), p. 247.

The United States court of appeals, ninth circuit, was presented with a similar problem in Hewitt v. Hewitt, supra, wherein a widow who was acting as administratrix failed to disclose to the court that decedent left an adopted son as an heir and because of such failure, the adopted son was omitted from the distribution. After the closing of the estate, the adopted son sued all the distributees for his share. Her excuse for not advising the court was that her husband said he had heard the adopted son was dead. In rejecting her contention, the court said:

"She made no inquiry for the adopted son, at his last known place of address or elsewhere, and maintained silence solely because of the hearsay statement made to her by her husband some years before. Had she communicated all of these facts to the court, it is not at all likely that a decree of distribution would have been entered without directing further investigation or inquiry—at least we have a right to so presume. Nor will we speculate as to what might have happened, had she pursued the proper course."

The court further held that the failure to tell the court the full facts amounted to an extrinsic fraud upon the missing heir. Had Mr. Cox, the administrator, known of the consul's efforts to locate plaintiffs in Sweden, the last-mentioned case would be completely applicable. The defendant, the beneficiary of her ill-gotten gains, owed a like duty to tell the administrator the full truth when inquiry was made of her.

The majority hold that the only mistake which authorizes relief is a mistake in-

duced by extrinsic fraud. This erroneously places mistake and fraud in the same category. In fraud there is wrongful conduct, actual or constructive, generally activated by evil motive, whereas in mistake there is no wrongful intention, actual or implied. The majority's view is founded upon the California district court of appeals decision of Hewitt v. Linstead, 49 Cal.App.2d 607, 122 P.2d 352, 354. Even this decision states that this "does not mean that mistake unconnected with fraud will not warrant relief under the proper circumstances" and cites the case of Bacon v. Bacon, 150 Cal. 477, 89 P. 317, 321. In that case the supreme court of California declared the erroneous distributees held property in trust for the right distributees and stated:

"It is urged that the power to review judgments extends only to cases where they have been procured by fraud, and that it does not exist with respect to judgment wrongfully given by reason of mistake either of the court or of the injured party. *No such distinction is recognized by the authorities.* The text-books all declare that such relief can be given where the former judgment was the result of a mistake, *unmixed with fraud,* and not the result of the negligence of the injured party." (Emphasis supplied.)

The foregoing statement of the California supreme court is correct. It is in harmony with the Restatement of Law, Restitution, section 126(c), wherein it is said:

"* * * where a trustee or other fiduciary, in the distribution of assets held for others pays money to a person whom he mistakenly believes to be a beneficiary, the real beneficiary is entitled to restitution from the transferee, unless the latter is a bona fide purchaser * * *"

Under this statement is the following illustration:

"2. A, administrator of B's estate, pays money out of the assets to C, B's brother, whom both A and C believe to be B's sole relative. Later D, B's son and next of kin, believed to be dead, appears. D is entitled to restitution from C."

The foregoing principles were applied even where, through error of law without any wrongful conduct, one thought to be an heir received a distributive share to which others were entitled. Moritz v. Horsman, 305 Mich. 627, 9 N.W.2d 868, 147 A.L.R. 117.

The true basis for a declaration of a constructive trust, whether through mere mistake or fraud, is whether under the facts one party has been unjustly enriched at the expense of another. Usually the facts involved misconduct of some nature but such is not necessary.

"It (constructive trust) is raised by equity in respect of property which has been acquired by fraud, or where, although acquired originally without fraud, it is against equity that it should be retained by the person holding it." 54 Am.Jur., Trusts, section 219, page 169.

A constructive trust is created when one *"in any way* against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy". 54 Am.Jur., Trusts, section 218, page 168. (Emphasis supplied.)

The late Judge Cardozo clearly stated the principle as follows:

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378, 380.

Restatement of Law, Restitution, section 160, uses this language:

"Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises."

These principles are sound and to the extent they are ignored injustice follows, as it does by the majority decision. These principles applied to the facts in this case would compel a different, and just, conclusion. This court has ruled many times that unless committed by former decision, we will follow the law as announced in the Restatement. For some reason the majority has chosen to depart from these rulings and anchor their decision to a California district court case, Hewitt v. Linstead, supra, which was construing a California statute. We have no such statute.

The majority claim that plaintiffs did not claim relief on the ground of unjust enrichment caused by mistake. Plaintiffs plead both mistake and fraud. In their brief, they call the court's attention to the fact they sought relief on two alternative bases, i. e., mistake and fraud. If the majority intend to inferentially rule that by not using the phraseology of unjust enrichment by mistake, plaintiffs waived the benefit of the correct rules of law applicable to the issue presented to the court, it would be a rule unknown in the annals of American jurisprudence.

We feel, therefore, that the majority are clearly in error when they establish the precedent that when one heir through mistake of fact receives the property rightfully belonging to another heir, equity will not grant relief without a clear showing of extrinsic fraud. A simple illustration shows the result of such a precedent. Sup-

44

pose a prisoner of war was thought by all to be dead. Several years later he showed up in a prison camp. Had his father died during this absence and the estate mistakenly distributed to other heirs, he would have no possibility of relief for the reason that the recipients committed no wrong but were only honestly mistaken. Absent the rights of third parties, we cringe to think equity could not rectify the wrong. Under its power to correct honest mistakes of fact which result in injustice, equity can and should see that justice prevails.

At the time of the litigation, Charles Nelsson was deceased and his son and sole heir, Adolph Nelsson, was entitled to Charles' distributive share. It may be said to Adolph's credit that upon discovery of the facts, he filed a separate amended answer admitting both the fraud and mistake alleged by the plaintiffs, undoubtedly recognizing the truth that it would be unconscionable for him to retain plaintiffs' property.

Whether equity and good conscience will impel the court to relieve against a wrong is a matter that rests within the bosoms of the judges passing upon the matter. There can be no prescribed legal definition as a guide, and the degree to which it operates correctly is dependent almost entirely upon that intangible thing we call sense of justice. Permitting the defendant to retain property which rightfully belongs to another offends our sense of justice and does not harmonize with our conscience. Neither in the record nor in the majority opinion does there exist any fact that warrants a finding the defendant in justice and good conscience is entitled to keep plaintiffs' property. There are no equities in her favor. They are all to the contrary. Since equity appeals to the conscience of the court, we have no hesitation after examining our conscience in requiring return of this property to its rightful owner.

Appellant contends that by reason of the statute of limitations and laches plaintiffs cannot recover. Neither of these matters was pleaded as a defense. Under all the authorities the statute of limitations must be pleaded, otherwise it is waived. Trujillo v. Trujillo, 75 Ariz. 146, 252 P.2d 1071. Under our rules either laches or the statute of limitations is an affirmative defense and is waived if not pleaded. Rules of Civil Procedure, Rule 8(c), section 21-406, A.C. A.1939, and Rule 12(h), section 21-436, A.C.A.1939. Consequently, these matters should be ignored. While the majority do not rule that plaintiffs are guilty of laches, there is a hint that in some wise they are to blame for the delay. That they are blameless is clear. They relied on the consul from whom the fact that distribution had been made was deliberately concealed. The consul assumed the estate would not be closed until he had discovered all the heirs. Whatever delay there was resulted in no injustice to defendant nor to third parties.

She is not injured if required to return property she never owned and no third party is interested.

The judgment of the trial court should be affirmed.

STRUCKMEYER, J., concurs.