**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| INDUSTRIAL PARK CENTER LLC, an Arizona limited liability company doing business as Mainspring Capital Group, *Plaintiff - Appellant*, v. GREAT NORTHERN INSURANCE COMPANY, a foreign insurer, *Defendant - Appellee*. | Nos. 24-4788 25-295 D.C. No. 2:22-cv-01196-MTL ORDER CERTIFYING QUESTION TO THE ARIZONA SUPREME COURT |

Filed December 23, 2025

Before: Susan P. Graber, Richard C. Tallman, and Bridget S. Bade, Circuit Judges.

# SUMMARY[*]

## Certification to Arizona Supreme Court

The panel certified to the Arizona Supreme Court the following question:

> Is damage to property a "fortuitous" loss when, based on the insured's knowledge at the time the insurance policy issued, it was reasonably foreseeable that such damage was almost certain to occur if certain preventative measures were not taken?

## ORDER

This appeal asks us to decide an issue of first impression under Arizona law. For the reasons discussed below, we certify the following question to the Arizona Supreme Court:

> Is damage to property a "fortuitous" loss when, based on the insured's knowledge at the time the insurance policy issued, it was reasonably foreseeable that such damage was almost certain to occur if certain preventative measures were not taken?

Plaintiff-Appellant Industrial Park Center LLC, d/b/a Mainspring Capital Group ("Mainspring"), owns a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

commercial building in Tempe, Arizona which, at the relevant time, was insured under an all-risk property insurance policy issued by Defendant-Appellee Great Northern Insurance Company ("Great Northern"). While that policy was in effect, Mainspring discovered that the building's structural integrity had been compromised by the routine business practices of one of its tenants, a wholesale seafood distributor, and submitted a claim of loss to Great Northern for the damage. After Great Northern denied Mainspring's claim, Mainspring sued Great Northern for breach of the insurance contract and for breach of the implied covenant of good faith and fair dealing.

The certified issue in this case is whether Mainspring's loss was "fortuitous," which is a requirement for coverage under an all-risk policy. *See Pac. Indem. Co. v. Kohlhase*, 455 P.2d 277, 278 n.1 (Ariz. Ct. App. 1969). In granting summary judgment to Great Northern, the district court ruled that Mainspring's loss was not fortuitous because the loss was "reasonably foreseeable and almost certain to occur" as a result of the tenant's longstanding business practices and Mainspring's failure to implement measures to prevent water damage. We find no controlling precedent defining fortuity in the decisions of Arizona's appellate courts. Because the answer has "important public policy ramifications" for the State of Arizona and "will have broad application" to a wide variety of contracts within the state, we respectfully certify this question to the Arizona Supreme Court under Ariz. Rev. Stat. § 12-1861. *Kremen v. Cohen*, 325 F.3d 1035, 1037–38 (9th Cir. 2003). If the Arizona Supreme Court decides not to accept certification, we will resolve this question based on our best understanding of Arizona law.

# I

## A

Starting in 1990, Mainspring leased part of the property to nonparty Star Fisheries, Inc., a wholesale seafood distributor. As part of its routine business practices, Star Fisheries would hose down the building's slab-on-grade foundation and exterior concrete staircase with fresh water throughout each workday. That practice twice resulted in significant damage to Mainspring's building.

### 1

The first discovery of damage resulting from Star Fisheries' tenancy occurred in 2010. A Mainspring executive had noticed signs of potential damage to the concrete walls and stairs at the Star Fisheries suite, and Mainspring decided to retain an engineering firm, Meyer, Borgman & Johnson ("MBJ"), to investigate the potential damage and recommend any necessary repairs.

After an initial site visit, MBJ issued a report dated August 6, 2010, finding that the building had been damaged in three respects. First, MBJ noted that there was "severe deterioration of the concrete stairs servicing Star Fisheries," which showed signs of "spalling and cracking" and had steel reinforcing bars that "were clearly visible and appeared corroded." Second, MBJ observed some minor cracking in the interior slab-on-grade, but noted that this damage was "not a life safety issue" because the slab-on-grade was "not a structural element" of the building. Third, on the exterior wall, MBJ "found cracks, spalling concrete, peeling and delaminating paint and discoloring of both the paint and concrete," with the damage to the wall being mostly "limited to the area of the wall that is below the slab-on-grade and appears to be retaining soil." MBJ believed that the damage

was caused by high moisture levels in the subgrade soil, which resulted from Star Fisheries' daily water use.

Mainspring then retained the geotechnical engineering firm Speedie & Associates to test MBJ's hypothesis. Speedie took three soil samples from under the Star Fisheries suite: two along the east wall (Samples 1 and 2), and one along the south wall within the cooler section (Sample 3). Speedie found that the moisture levels for Samples 1 and 2 "were about normal," whereas the soil in Sample 3 was "very moist, at or above the plastic limit." Because moist soil tends to expand, which can create "increased uplift pressure under the slab and against the dock high tilt panel walls" and "contribut[e] to wall and slab movement," Speedie concluded that "the observed distresses [in the concrete] are related to the increase[d] moisture levels within the subgrade soils." Speedie noted two possible causes of the abnormal moisture levels: (1) possible leaks or defects in the installed floor drains; and (2) cracks and control joints that were not "properly sealed to prevent water seepage through the slabs."

MBJ then issued a final report dated October 28, 2010, recommending a five-step remediation program. First, MBJ recommended that Mainspring "determine how water is migrating into the subgrade," with a specific focus on whether "installed floor drains are not working properly, are leaking or [are not] correctly tied to a final drain." Second, MBJ recommended that "weep holes be installed in the exterior walls of the building, below finished floor elevation," to drain existing moisture from the soil and alleviate existing hydrostatic pressure on the walls. Third, MBJ recommended that all cracks, control joints, and saw cuts in the slab-on-grade be sealed "to prevent further damages to the concrete slab or the building walls." As part

of the third step of the remediation program, MBJ also recommended optional preventative measures to further mitigate against future damage: (1) installation of "a water proof floor coating," which would "completely prevent future infiltration of moisture into the subgrade"; (2) removal and replacement of "large sections of concrete slab" and installation of "a 4-inch layer of [aggregate base course] subgrade and a vapor barrier system below the concrete slab"; and (3) installation of "an additional drain tile system . . . along the southwest interior perimeter of the building to catch and release any surface moisture placed near the concrete wall panels if future moisture infiltration exists."[1]   Fourth, MBJ recommended that the exterior concrete stairs be demolished and rebuilt, as they were so degraded that repair was not feasible.   Fifth, MBJ recommended that the southern concrete tilt-walls be repaired after moisture mitigation was completed.

In 2011, Mainspring did almost everything that MBJ had recommended: it inspected and tested all trench drain locations and replaced faulty systems, installed weep holes in the concrete tilt wall panels, sealed all major cracks in the flooring, and repaired all concrete tilt wall panels and stair locations after moisture mitigation was completed. Mainspring did not, however, take any of the optional measures described in the third step of MBJ's remediation program—installing a waterproof floor coating, a barrier between the slab-on-grade and the soil, or an additional drain system.

---

[1] As the primary author of the report testified in deposition, MBJ laid out these alternatives "to provide the owner different pricing options" of ways "to mitigate moisture intrusion through a slab-on-grade floor."

Shortly after MBJ issued its final report, Mainspring amended its lease with Star Fisheries to make Star Fisheries responsible for the costs of remediating the damages caused. And in 2014, Mainspring included a provision in Star Fisheries' lease that made Star Fisheries responsible for certain restoration obligations—effective upon surrender of the property—related to its "perpetual use of the Premises as (1) a 'wet environment' and (2) to house freezer/cooler units."

2

The second discovery of damage resulting from Star Fisheries' tenancy occurred in 2021. The first signs of damage—cracking and spalling in concrete wall panels and stairs near the Star Fisheries docking bay—were discovered by Robert Vallelonga & Associates, an engineering firm that Mainspring had hired to perform unrelated, routine concrete repairs at the building. Further investigation suggested that there was deterioration in the concrete panels near the Star Fisheries suite, at least some of which was due to water damage. In September 2021, Mainspring retained R. Lloyd Hamblin, a civil engineer, to inspect the site further. Hamblin confirmed the presence of "[c]racked and delaminated concrete tilt panel walls" and that the concrete stairs had "cracked, delaminated and settled under stoop." Hamblin recommended repairing or replacing the damaged walls and alerted Mainspring to the possibility that the concrete's reinforcing steel may have been compromised, which would require further investigation and more intensive repairs.

In January 2022, while replacing the stairs as Hamblin recommended, Mainspring discovered that the concrete tilt panels behind the stairs had degraded to such an extent that

the building's structural integrity was compromised. Mainspring sent a notice of loss to Great Northern.

3

After receiving Mainspring's notice of loss, Great Northern retained Nelson Forensics, LLC, an engineering consulting firm, to investigate and determine the cause of the damage to Mainspring's property. In its investigation, Nelson observed significant concrete delamination, cracking, and spalling of tilt wall panels along the east exterior wall consistent with those panels having been "subjected to a corrosive environment for many years/decades." Although the deterioration was "most severe" by the Star Fisheries suite, the "pattern of concrete distress was present along the full length of the east exterior wall." Because Nelson could not identify "[any] means for water/salt spillage at the Star Fisheries suite to affect the tilt wall panels at the north portion of the structure's east elevation," Nelson concluded that, although Star Fisheries' water and salt use "may have exacerbated" the damage at the southern portion of the building, it was not related to the damage elsewhere in the building.

After receiving Nelson's report, Great Northern denied coverage for the loss. Its denial letter to Mainspring, dated March 18, 2022, explained that, based on the results of Nelson's investigation, Great Northern had determined that the property "was damaged as a result of poor/inadequate soil preparation and compaction, settlement, and long-term corrosion," a loss which it believed fell within the policy's inherent-vice, faulty-workmanship, settling, and wear-and-tear exclusions. The letter closed by offering Mainspring an opportunity to respond.

In April 2022, Mainspring requested reconsideration, arguing that Nelson's conclusions were based on an inadequate investigation and that subsequent remediation work suggested that Star Fisheries' water use caused the loss. Alongside its request, Mainspring included a counter-report from R. Lloyd Hamblin, the engineer who had first inspected the property the previous September. Hamblin contended that Nelson's conclusions were "based on speculation" and "contradicted by the actual conditions at the [property]." Hamblin insisted, based on his observations and testing, that the delamination of the concrete tilt panel walls was caused by corrosion of the reinforcing steel within the concrete due to water infiltrating the concrete, and he asserted that the source of this water was Star Fisheries.

After receiving Mainspring's request, Great Northern had Nelson conduct a second site visit and issue a supplemental report with revised conclusions. After revisiting the site and reevaluating the evidence, Nelson agreed with Hamblin that the damage was "consistent with being caused by long-term, repetitive exposure to excess moisture" and that "[t]he source of excess moisture affecting the soils and tilt wall panels [was] long-term, repetitive water/mineral use and/or spillage at the Star Fisheries suite."

Notwithstanding Nelson's revised conclusions, Great Northern again denied coverage for Mainspring's claim of loss. Great Northern asserted that this cause of loss was expressly excluded from coverage by the wear-and-tear and settling exclusions, and that the water exception to the wear-and-tear exclusion did not apply because "there [was] no evidence of any ensuing damage [caused by water]" because the "damage [itself] is the wear and deterioration." Accordingly, Great Northern concluded that "no coverage for the repair of the Building exist[ed]."

## B

Mainspring filed suit in the Superior Court for Maricopa County, claiming that Great Northern (1) breached the terms of the insurance policy by denying coverage and payment for the damage to Mainspring's property and (2) breached its duty of good faith and fair dealing as an insurer by failing to act reasonably in processing Mainspring's claim. The case was then removed to federal court based on diversity of citizenship.

In January 2024, Great Northern moved for summary judgment on both claims, and Mainspring moved for summary judgment on the breach of contract claim only. The district court granted Great Northern's motion for summary judgment on both claims, denied Mainspring's motion for partial summary judgment on the breach of contract claim, and awarded Great Northern $198,234 in attorneys' fees.

On the breach of contract claim, the district court concluded that Mainspring failed to show that its loss was fortuitous, which is a necessary condition for coverage under the all-risk policy. Although the district court found that nothing in the record suggested that Mainspring knew the loss would occur at the time of contracting or that Mainspring intentionally caused the loss to occur, the district court reasoned that the loss was not fortuitous because it "was reasonably foreseeable and almost certain to occur." Specifically, the district court noted that Mainspring took only the measures that MBJ recommended "to mitigate future moisture intrusion," not the measures recommended to "prevent it." So long as Star Fisheries continued to lease the space, its "continued practice of washing down the concrete slab and its use of sub-zero freezers would almost

certainly continue to introduce moisture into the soil and eventually affect the building's infrastructure."

Moreover, the clause in Star Fisheries' lease shifting the cost of any repair to the tenant upon surrender suggested that Mainspring anticipated "that future damage may occur as a result of Star Fisheries' occupancy," making such damage "reasonably foreseeable."  Accordingly, "the risk was not covered by the all-risk policy," and Great Northern therefore did not breach the contract.

Mainspring appealed both the judgment and the fee award, and these appeals were consolidated in May 2025.

## II
## A

The primary issue is whether Mainspring's loss was "fortuitous."  *See Kohlhase*, 455 P.2d at 278 n.1.  When recovery is sought under an all-risk property insurance policy, the insured must show that the loss was fortuitous to "establish a prima facie case" of coverage. *Id.* at 279.  Once this showing is made, the burden shifts to the insurer to show "that the loss was within a policy exclusion."  *Id.* Accordingly, the fortuity of Mainspring's loss is potentially dispositive of its breach of contract claim.[2]  Whether a loss was fortuitous "is a legal question for the court." *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 77 (3d Cir. 1989); *accord Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1281 (6th Cir. 1995); Stephen A. Cozen

---

[2] The issue of fortuity does not, however, bear on Mainspring's bad faith claim—Great Northern did not rely on fortuity in denying Mainspring's claim of loss, and it is not necessary to show breach of contract to establish an insurer's bad faith under Arizona law.  *See Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279–80 (Ariz. 2000); *Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1269 (Ariz. 1992).

& Richard C. Bennett, *Fortuity: The Unnamed Exclusion*, 20 Forum 222, 231 (1985).

The parties agree that Arizona's appellate courts have yet to define the parameters of when a loss is fortuitous. We likewise have been unable to find any published appellate decisions that would guide us on this issue.

Accordingly, this issue is eligible for certification. *See* Ariz. Rev. Stat. § 12-1861 (permitting certification of questions of state law "which may be determinative of the cause" and for which it appears "there is no controlling precedent in the decisions of the supreme court and the intermediate appellate courts of [Arizona]"). "We invoke the certification process only after careful consideration and do not do so lightly." *Murray v. BEJ Mins., LLC*, 924 F.3d 1070, 1072 (9th Cir. 2019) (en banc) (quoting *Kremen*, 325 F.3d at 1037). We believe that this issue warrants certification for the following reasons.

First, "the issue is [novel], substantial, and of broad application." *Id.* The fortuity requirement is not limited to all-risk policies like the one at issue in this case. Rather, fortuity is "[i]mplicit in the concept of insurance," 7 Couch on Insurance § 102:7 (3d ed. 2025), and indeed in all contracts involving "aleatory" promises, *see* Restatement (First) of Contracts § 291 & cmt. *a* (1932) (defining an "aleatory promise" as one that is "conditional on the happening of a fortuitous event, or an event supposed by the parties to be fortuitous"). Accordingly, any decision defining fortuity under Arizona law will implicate not only every such insurance policy in the state, but may also implicate every other aleatory promise under Arizona law, such as betting contracts, suretyship agreements, guaranties, covenants of title, and warranties of goods. 8 Corbin on

Contracts § 38.1 & n.26 (rev. ed. 2025).  Given the sweeping breadth of the doctrine's application and the lack of precedent from the Arizona courts, "the spirit of comity and federalism cause us to seek certification." *Kremen*, 325 F.3d at 1038; *cf. U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1133 (9th Cir. 2011) ("[O]ne of the goals in deciding state law questions is to do no harm to state jurisprudence.").

Second, the issue involves competing public policy considerations that are best resolved by the state's highest court.  *Murray*, 924 F.3d at 1072; *McKesson v. Doe*, 592 U.S. 1, 5–6 (2020) (per curiam).  The principle that insurance may cover only the risk of fortuitous loss is one of the few "mandatory rules" of insurance law—a rule that is considered to "protect interests or further goals that are sufficiently important to supplant freedom of contract." Kenneth S. Abraham, *Peril and Fortuity in Property and Liability Insurance*, 36 Tort & Ins. L.J. 777, 780 (2001).  It has been suggested that allowing coverage for a non-fortuitous event would tend to encourage fraud and reward the intentional destruction of insured property, both of which are contrary to public policy in Arizona.  Cozen & Bennett, *supra*, at 222, 233–34; Abraham, *supra*, at 791; *cf. In re Rose's Estate*, 493 P.2d 112, 115 (Ariz. 1972) (discussing the equitable principle that "no one can take advantage of his own wrong" and the "sound public policy requiring that the law should not become the instrument of designing persons to be used for the purpose of fraud" (quoting *Honk v. Karlsson*, 292 P.2d 455, 457 (Ariz. 1956))).

These weighty considerations are counterbalanced by "Arizona's longstanding public policy favoring freedom of contract," which would suggest that mandatory rules should ordinarily be construed narrowly.  *Pointe 16 Cmty. Ass'n v. GTIS-HOV Pointe 16, LLC*, 575 P.3d 368, 372–73 (Ariz.

2025).   How these competing public policy considerations bear on the doctrine of fortuity is a question that the Arizona Supreme Court should have an opportunity to address in the first instance.  *Cf. Rattagan v. Uber Techs., Inc.*, 19 F.4th 1188, 1192–93 (9th Cir. 2021) (certifying to the California Supreme Court a question implicating similar competing public policy concerns).

Certification is also important to ensure that future cases in our circuit are decided in accordance with Arizona law.  If we were to interpret the scope of fortuity ourselves in a published opinion, that interpretation would be binding on district courts in the Ninth Circuit—even if it were contrary to Arizona's public policy.  Therefore, the "spirit of comity and federalism" counsels us to certify this issue to the Arizona Supreme Court to establish a rule for us to follow in future diversity cases.  *Murray*, 924 F.3d at 1072.

B

Accordingly, we certify the question set forth at the beginning of this order to the Arizona Supreme Court and respectfully ask the Court to accept certification under Ariz. Rev. Stat. § 12-1861.  Our phrasing of the question should not restrict the Court's consideration of the issues involved. The Court is not limited to the particular question outlined above, and it may modify or expand upon that question as it deems appropriate.  If the Court decides not to accept certification, we will decide the question as we believe an Arizona court would.  *See Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1171 (9th Cir. 2001).

III

The Clerk will file a certified copy of this order with the Arizona Supreme Court under Arizona Supreme Court

Rule 27. This consolidated appeal is withdrawn from submission and will be resubmitted following the conclusion of any proceedings in the Arizona Supreme Court. The Clerk is directed to administratively close these dockets, pending further order. We retain jurisdiction over any further proceedings in our court. The parties will notify the Clerk within fourteen days after the Arizona Supreme Court accepts or rejects certification and again within fourteen days after an opinion is rendered. A list of counsel appearing in this matter, together with their addresses and telephone numbers, is included below.

Counsel for Plaintiff-Appellant Industrial Park Center, LLC, d/b/a Mainspring Capital Group:

> Chad L. Schexnayder
> cls@jkwlawyers.com
> Laurence R. Sharlot
> lrs@jkwlawyers.com
> Joseph A. Brophy
> jab@jkwlawyers.com
> Jennings Haug Keleher McLeod Waterfall
> 2800 N. Central Ave., Suite 1800
> Phoenix, AZ 85004
> (602) 234-7800

Counsel for Defendant-Appellee Great Northern Insurance Company:

> Douglas J. Collodel
> douglas.collodel@clydeco.us
> Clyde & Co. US LLP
> 355 S. Grand Ave., Suite 1400

Los Angeles, California 90071
(213) 358-7600

Amy M. Samberg
amy.samberg@clydeco.us
Amanda R. Hough
amanda.hough@clydeco.us
Clyde & Co. US LLP
1 N. Central Ave., Suite 1030
Phoenix, Arizona 85004
(480) 746-4580

**IT IS SO ORDERED.**

/s/ Bridget S. Bade
Bridget S. Bade,
United States Circuit Judge, Presiding