[Civ. No. 5636.   Third Appellate District.—November 2, 1936.]

HUGO T. ZAREMBA, Respondent, v. WALTER WAYNE WOODS et al., Appellants.

C. E. Christopher and James C. Bone for Appellants.

Sherer & Daugherty, Harry A. Daugherty, Elmer B. F. Collier and Marshall Stimson for Respondent.

PLUMMER, J.—In this action the plaintiff obtained a judgment and decree to the effect that a certain agreement and will executed by Adolph Erich Zaremba were procured by undue influence; that in the securing of the probate just referred to Walter Wayne Woods was guilty of extrinsic fraud. The decree further adjudged that all of the property in possession of the defendant, Walter Wayne Woods, was held in trust by him for the benefit of the heirs of said deceased, and of the persons entitled to receive the same upon distribution thereof. From this judgment and decree the defendants appeal.

The will and agreement just referred to were executed on or about the twelfth day of October, 1932. The death of Adolph Erich Zaremba occurred on or about the twenty-ninth day of January, 1933. At the time of his death the deceased was of the age of forty-nine years.

The second paragraph of the will contained, among other things, the following:

"First: I hereby declare that I am a single man, and that I have no wife, child, grandchild, father, or mother living, and no next-of-kin, with the exception of my brother Hugo Zaremba, who is now living, and inasmuch as he is well provided for, I make no provision for him by this, my last will."

The extrinsic fraud relied upon by the plaintiff as committed by Walter Wayne Woods (known and hereinafter referred to as "Dr. Woods"), is based upon the petition filed by him for the probate of the will of Adolph Erich Zaremba, deceased, in which the statement appears that the deceased left no heirs; that this statement was made for the purpose of preventing the heirs of the deceased learning of the passing of Adolph Erich Zaremba, and of the fact of

his having made a will in favor of Dr. Woods—the will in question having left all the property of the deceased to the doctor—and it also being specifically stated in the will that the deceased had a brother named Hugo Zaremba. The will further recited that it was made in recognition and appreciation of the skillful care and professional medical treatment rendered by the doctor to the testator. The agreement to which we have referred provided for the doctor taking care of the deceased during his lifetime, and to receive in compensation whatever property was left by the deceased. In this connection it may be stated that the record shows that the deceased was in receipt of a trifle more than $200 per month; had to his credit a bank account of $500, and up to the time of the drawing of the instruments referred to had paid the doctor in full for his services and had also loaned the doctor $200 in addition, which appears not to have been repaid.

For several years prior to his death, Adolph Erich Zaremba had been in poor health, being afflicted with tuberculosis. He had lived with a family by the name of Buck for over eleven years. About two years before the death of Zaremba, Dr. Woods was called to attend him, and from that time until the death of Zaremba, continued to act as his attending physician. During the time that Dr. Woods was so acting as the attending physician of Zaremba, he learned of the execution of a will by Zaremba, leaving to the Buck family all of his property. He learned of the execution of this will by reason of being requested to act as a witness thereto. The will was admitted to probate on the eighth day of March, 1933. The plaintiff did not learn of the fact of there being a will, or of its probate until more than six months had elapsed. He acquired such knowledge upon coming to California for the purpose of visiting his brother, and for the first time ascertained that his brother had died on the 29th of January, 1933. The time having elapsed for the contest of the probate of the will referred to, the plaintiff filed his complaint in equity, based upon the alleged extrinsic fraud of the doctor in concealing the fact of the deceased having relatives, it being alleged in the complaint that the statement in the petition that the deceased died without leaving relatives was known by the said doctor to be false, and was fraudulently made for the purposes of con-

cealing the fact of the death of Adolph Erich Zaremba, and of the proceedings for the probate of his will.

The testimony in this case is so voluminous that instead of setting forth the salient provisions thereof, we adopt the concise statement made by the trial judge, which sets forth clearly the extrinsic fraud practiced by Dr. Woods, and also facts showing beyond controversy the obtaining of the will and agreement referred to by undue influence.

''This is a suit by the brother of Adolph Erich Zaremba who was a Spanish and World War veteran and who was receiving during a considerable part of his lifetime a total incapacity pension of one hundred dollars per month. It seems that he was shell-shocked and wounded in World War while in France, and after his return to America he developed tuberculosis. A little more than two years before his death he commenced to have hemorrhages, and was a very sick man from that time until his death. Of course he gradually became more and more weak physically and less and less able to take care of himself After it became necessary for him to have a nurse the federal government allowed him fifty dollars a month additional, for nurse hire. . . . He then came to California and persuaded Mrs. Buck to rent a room to him, and told her that if she would let him live with her and occupy that room until his death he would make a will leaving everything he possessed to her. At that time he had a ten thousand dollars life insurance policy with the federal government and was drawing fifty-seven dollars and fifty cents ($57.50) per month from it which had to be deducted from the principal amount of the policy. He lived with Mr. and Mrs. Buck for over eleven years, and at the time he had his first hemorrhage Mrs. Buck on her own initiative called her own physician, Dr. Walter Wayne Woods, to attend him. He continued to attend him until his death.

''Shortly after Woods was called to attend Zaremba, Woods, at the request of Zaremba and Mrs. Buck, acted as a witness to a will which was made by Zaremba, leaving his entire estate to Mrs. Buck, and, in the event of her death before Zaremba died, to her surviving husband. Dr. Woods learned the contents of that will at the time, and as Zaremba gradually grew worse and as the probability of the term of his life decreased proportionately, Dr. Woods formed the

intent and purpose to induce Zaremba to revoke the will he had made leaving all his property to Mrs. Buck and her husband, and to make a new will in which he would leave all his property to Dr. Woods in consideration of the doctor taking care of him and furnishing a nurse for him up to the time of his death.

"Dr. Woods was not able to carry out this design and purpose when he first conceived it because his wife absolutely refused to have a tuberculosis patient in their home on account of their children. About the month of July, 1932, however, Dr. Woods learned of a residential property which had a house on the front part of the lot, which was suitable for him and his family, and also had in addition thereto an apartment over the garage which was on the rear end of the lot. This property belonged to an estate and a Mrs. Harris was executor thereof, and was likewise the sole beneficiary of the estate which was indebted to Dr. Woods in a substantial sum of money for professional services given by him to the decedent who had been nursed by Mrs. Harris, who had served as a nurse on quite a number of other cases under Dr. Woods prior to that time. The decedent last mentioned was also living in the house of Mrs. Buck at the time that Mrs. Harris and Dr. Woods attended him.

"Dr. Woods negotiated with Mrs. Harris for the purchase or rental of the aforesaid residential property, and in negotiating for the purchase thereof, he told Mrs. Harris that he wanted to get the property so he could get Zaremba to move into the flat over the garage which was then occupied by Mrs. Harris herself, and that he wanted to do this because he was convinced that if he could supply a home for Zaremba close to himself, he could induce Zaremba to revoke the will under which he was leaving all of his property to Mrs. Buck, and induce him to make a new will leaving all of his property to Dr. Woods, and that the amount of the life insurance which Dr. Woods thus received would be sufficient to enable him to purchase the aforesaid property if he failed to borrow the money for that purpose from his father-in-law who lived in San Francisco and whom he was going up to see with the purpose of borrowing money for that purpose from him, if possible.

"Mrs. Harris testified to all of this, and also, that upon his return from San Francisco Dr. Woods made an oral agreement with her to purchase the property, with the understanding that he was to pay for the same with the money which he would receive from the government life insurance policy of Zaremba. . . .

"Dr. Woods got possession of this real property on or about August 12, 1932, with the further agreement that during the pendency of his purchase thereof he was to pay sixty dollars ($60) per month for the entire property. Thereupon, and within a day or two thereafter, he took Zaremba in his automobile and showed him the apartment over the garage and rented the same to him completely *unfurnished* for thirty dollars ($30) per month.

"Dr. Woods testified that Zaremba paid him for his services in full down to the date that Zaremba took possession of the apartment, and that Zaremba agreed orally with the doctor, at the time he looked at the apartment, that if the doctor would let him remain there until his death, he would revoke the will under which he gave all his property to Mrs. Buck, and would make a new will giving all his property to Dr. Woods, if the doctor would also take care of him until the time of his death, and furnish him with the necessary nurses. The doctor testified that he then and there agreed to do so.

"Later, an attorney selected by Dr. Woods prepared a written agreement to the effect of the foregoing, and also prepared a will to the foregoing effect, and Dr. Woods took this attorney to Zaremba and introduced him.

"This attorney testified that Dr. Woods left before the attorney talked with Zaremba about the proposed will, and that Zaremba told him what he wanted to put in the will, and that in the first will he prepared he inserted the statement that Zaremba had one full brother, but that Zaremba did not know whether or not he was living, as he had not heard from him for several years, and that when he took the first draft of the will to Zaremba, the latter insisted that the aforesaid statement must be eliminated, as he had heard from his brother within the last or preceding two years, and that his brother was living in Chicago, Illinois.

"I am convinced that the statement in the first draft of the will about Zaremba not knowing whether his brother

was dead or not, and that he had not heard from him for years, was given to the attorney by Dr. Woods, who later made that same statement to the secretary and stenographer of the attorney who tried this case for Dr. Woods, and thus led her to insert in the petition for the probate of the will a statement to the effect that the testator left no heirs-at-law surviving him. Moreover, from the relations between Dr. Woods and the decedent I am further convinced that Dr. Woods knew at the time he made that statement to the clerk or stenographer of his attorney in this case, that the full brother of the decedent was living in Chicago, Illinois, and that if notice was given to him in any way of the death of his brother he would doubtless come to California and resist the probate of the will leaving all of the property to Dr. Woods, and hence that this false statement was made by Doctor Woods to the stenographer of his attorney in this case with the intent and purpose of thereby preventing the full brother of decedent from receiving notice of his death, and from having his day in court in opposition to the probate of the aforesaid will. As a matter of law it seems to me, therefore, that Dr. Woods was guilty of extrinsic fraud upon the full brother of the decedent and upon the probate court of this state and county, and thereby prevented said full brother, the plaintiff in this case, from having his day in court in opposition to the probate of said will, because, said brother did not learn about the death of his brother until after the expiration of one year after the date of probate. . . .

''It must be kept in mind that the decedent took no independent advice from anybody in relation to the making of his will, and that the attorney who drafted the will was the attorney for Dr. Woods, and was, in fact, selected by Dr. Woods, and that attorney testified that he personally suggested the making of the written contract which is in evidence in addition to the will, because he felt that he represented both Dr. Woods and Zaremba, and which contract assigns to Dr. Woods all of the property of the decedent, particularly mentioning and including his life insurance policy, and everything else of every kind and character, and this assignment was to take effect immediately, in consideration of the promise of Dr. Woods to take care of

decedent professionally and to furnish him with necessary nurses.''

It must be borne in mind that during all the time referred to, and covering all the transactions referred to in the foregoing excerpt from the opinion of the trial court, a fiduciary (misprinted ''fictitious'') relationship existed between Zaremba and Dr. Woods as his attending physician, and charged the doctor thereby with the utmost fairness in all his business transactions with Zaremba.

The record further shows that the value of the property for which Dr. Woods negotiated with Mrs. Harris was somewhat in excess of $16,000, and that his only hope of being able to purchase the same was through the means and methods of obtaining all the property that should be left by Adolph Erich Zaremba at the date of his death. It seems not to have occurred to the doctor that such a scheme embodied the rankest kind of fraud.

The appellants upon this appeal contend that the evidence shows intrinsic and not extrinsic fraud, and that the third amended complaint, filed to conform to the truth, does not state facts sufficient to constitute a cause of action. The latter contention requires but little consideration. The complaint does set forth specifically the action of Dr. Woods in seeking to prevent knowledge of the will and of its probate, being acquired by the heirs of the deceased, and that he knowingly and falsely stated in the petition for probate of the will that there were no such heirs. That in itself is an extrinsic statement. When the doctor appeared for the probate of the will and testified to such facts, his testimony would be considered before the court as intrinsic fraud, based upon which we may admit no suit in equity would lie. There is a clear line of demarkation, however, between a statement made in the petition for the probate of the will which would limit the giving of notices to heirs, and testimony in court to the effect that there were no such heirs, after the heirs had been notified of the proceeding for the probate of the will, as provided by the different sections of the Probate Code.

The contention is first made that there is no testimony showing that the doctor had any information or knowledge of the existence of any relatives of the deceased. This statement is directly contrary to the record which the doctor

had in his possession. The will states specifically that the deceased had a brother named Hugo Zaremba. This will was filed by the doctor, and it is inconceivable that he did not have knowledge of its contents at the time he filed his petition for its probate, and the trial court, upon such a state of facts, was amply justified in concluding that the doctor did have knowledge of the existence of relatives left by the deceased.

For the purpose of a further discussion, it will be admitted that the petition filed by Dr. Woods for the probate of the will of Adolph Erich Zaremba, deceased, gave the probate court jurisdiction. That, however, is no answer to the alleged extrinsic fraud.

In support of their contentions, the appellants cite the case of *Pico* v. *Cohn*, 91 Cal. 129 [25 Pac. 970, 27 Pac. 537, 25 Am. St. Rep. 159, 13 L. R. A. 336], being a leading case, where the subject of intrinsic fraud is discussed, and where it was sought to set aside the decree on the grounds of fraud committed in the giving of perjured testimony. The court said: ''And we think it is settled beyond controversy that a decree will not be vacated merely because it was obtained by forged documents or perjured testimony. The reason of this rule is that there must be an end of litigation, and when parties have once submitted a matter, or have had the opportunity of submitting it for investigation and determination, and when they have exhausted every means for reviewing such determination in the same manner, it must be regarded as final and conclusive, unless it can be shown that the jurisdiction of the court has been imposed upon, or that the prevailing party, by some extrinsic or collateral fraud, has prevented a fair submission of the controversy.'' The court then goes on to state what constitutes extrinsic or collateral fraud, among which is keeping the unsuccessful party away from the court, or purposely keeping him in ignorance of the suit, etc.

The case of *Nicholson* v. *Leatham,* 28 Cal. App. 597 ·[153 Pac. 965, 155 Pac. 98], relied upon by the appellants, is readily distinguishable from the case at bar. The Nicholson case holds that an order admitting a will to probate is not void because of the omission to state in the petition the names and ages and residences which are not set forth therein. It is unquestioned that an action in equity will not lie to

set aside the probate of a will simply because of such omission, or to hold the devisees in such case trustees for the heirs. In the case at bar it is not sought to set aside the will, nor is it sought to hold Dr. Woods trustee upon the simple fact alone that no heirs are mentioned in the will, but upon the false and fraudulent statement made in the petition for the purpose of preventing heirs learning either of the death of Zaremba or of the proceedings instituted by the doctor for the probate of Zaremba's will. After holding that the rule is absolute that a mere defect in the petition in not stating the names of heirs is not sufficient, the court does add: "The rule is absolute, save in cases where there has been a breach of duty arising from a fiduciary relation on the part of those securing the probate of the will; that the acts alleged to constitute extrinsic fraud must be such as to operate to prevent the heir from appearing in the Probate Court, and there contesting the will and exhibiting fully his case against its being admitted to probate."

The case of *Monk* v. *Morgan*, 89 Cal. App. 154 [192 Pac. 1042], deals only with defective notices and false testimony given in court. The defective notice in that case was held not to deprive the court of jurisdiction, and the perjured testimony given upon the hearing of the case was held to be intrinsic fraud. We find nothing in the case at bar to the effect that any of the parties had connived with heirs receiving notice.

Sections 326 to 328, inclusive, of the Probate Code, provide for the giving of notices. The omission of stating the fact of heirs in the petition filed by Dr. Woods necessarily prevented the clerk of the court from giving the notices specified in section 328, *supra*, to be given.

That an action in equity will lie just as here instituted, we need cite only one case, to wit, *Caldwell* v. *Taylor*, 218 Cal. 471 [23 Pac. (2d) 758, 88 A. L. R. 1194]. This case quotes at length from the case of *United States* v. *Throckmorton*, 98 U. S. 61 [25 L. Ed. 93]. The distinction between extrinsic and intrinsic fraud is there clearly defined. The extrinsic fraud consists in the deception practiced by the successful party in keeping his opponent in ignorance of the proceeding. Intrinsic fraud is mentioned as being perjured testimony given at the trial. This case also establishes the law that where extrinsic fraud is shown to exist,

the successful party may be held a trustee for the benefit of those who are entitled to receive the property of the estate. While the judgment or decree of the probate court is not set aside, the distribution of the property may be ordered made to those legally entitled to receive the same.

In the case at bar it was necessary for the plaintiff to establish two facts: 1st. That the agreement and will referred to herein were obtained by fraudulent practices, to wit, undue influence; and 2d. That Dr. Woods was guilty of extrinsic fraud in the methods adopted by him to prevent the heirs of said deceased from receiving knowledge either of the death of the deceased, or of the proceedings for the probate of the will. Both of these propositions appear to us to be established beyond controversy.

The judgment is affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 28, 1936.