[Civ. No. 22209. Second Dist., Div. Two. Apr. 29, 1957.]

SARAH KATHERINE STOKES HARKINS et al., Respondents, v. LANDON FIELDER, as Executrix, etc., et al., Appellants.

[Civ. No. 22210. Second Dist., Div. Two. Apr. 29, 1957.]

KENTON E. KROGSTAD, as Administrator, etc., Respondent, v. LANDON FIELDER, as Executrix, etc., et al., Appellants.

Johnson & Johnson for Appellants.

Charles E. Frisco, Benjamin Hansen, Arthur Lund and Peter H. Stevens for Respondents.

FOX, J.—Plaintiffs in the instant actions sought an adjudication that certain property, formerly part of the Estate of Eldridge James Stokes, was held in trust for them. As an alternate remedy they sought recovery of damages for fraud. The court held in favor of their contentions and appeals from the judgments followed.

On March 20, 1946, one Eldridge J. Stokes died intestate in Los Angeles County. His estate consisted of both real and personal property. The only California resident surviving him was a brother, Oscar F. Stokes. Also surviving him were a half-brother, James W. Stokes, and four married half-sisters named Landon Fielder, Sarah Harkins, Gertrude Davidson and Georgia Bell.[1] At all times here material, these brothers and sisters of the half blood, with the exception of Mrs. Bell, resided in Oklahoma. Mrs. Bell resided in Texas as well as in Oklahoma. Mrs. Fielder is an appellant herein. The other out-of-state kin are sometimes referred to as respondents.

Upon Eldridge's death, Oscar Stokes notified his half-sister, Mrs. Harkins, of the passing of their brother. Mrs. Harkins communicated this information to Mrs. Fielder, Mrs. Davidson and Mrs. Bell, who came to California to attend the funeral. These latter remained in California less than three days before departing for their homes.

In due course, the administration of Eldridge's estate was instituted. By agreement between Oscar and Eldridge's sister-in-law, Ethel Hamilton, who desired a disinterested person as administrator, one Robert Lewis was prevailed upon to apply for letters of administration. Lewis, who was an old friend of Eldridge, had only a casual acquaintance with Oscar. Lewis selected the law firm of Schweitzer & Schweitzer to handle the administration of the estate. Lewis accompanied Oscar to the Schweitzer office and introduced him to the partners. He left the office while Oscar was being interviewed about Eldridge's estate.

The record is barren of precise information about what took place during that interview. The surviving member of the firm, now the Honorable Harold Schweitzer, Judge of the Superior Court in and for the County of Los Angeles, has no recollection of any of the details of the administration. However, the parties stipulated that at the time Eldridge's estate was probated, it was the custom and practice of the firm of Schweitzer and Schweitzer, in preparing petitions for letters of administration, to interrogate their clients as to other living kindred of the decedent. Following the conference with Oscar, the Schweitzer office prepared a document entitled "Nomination of Administrator." This document, which was signed by Oscar, recites that he "is the sole heir

---

[1] Mrs. Bell is since deceased and her estate is represented as a party plaintiff by K. E. Krogstad, administrator thereof.

at law'' of Eldridge and designates Lewis to serve in his stead as administrator. This nomination was filed in the superior court simultaneously with a petition for letters of administration signed by Lewis. Lewis' application for appointment as administrator recites that he is ''nominee of the sole heir at law'' and lists only Oscar as an heir of Eldridge. Both these documents were apparently prepared by Schweitzer and Schweitzer, who appear thereon as attorneys of record. Lewis testified he did not know Eldridge had sisters and a brother other than Oscar who survived him. During Lewis' service as administrator, Oscar at no time informed him of the existence of such kin. Lewis could not remember whether he saw the ''Nomination of Administrator'' before signing his petition for letters of administration. At one point, in response to a question regarding the basis of the statement in his petition for letters of administration that he was the nominee of the sole heir at law, Lewis testified, ''it was based purely upon the request.''

Lewis' petition was granted and he assumed the office of administrator. Upon completion of the administration, the estate was distributed to Oscar as sole heir at law. On January 4, 1947, Oscar signed and filed with the court a distributee's receipt acknowledging ''receipt of all the property coming to me as the only heir at law'' of Eldridge.

Mrs. Fielder testified that after the funeral, in a conversation with Oscar about Eldridge's property, he told her ''that part went to Ethel [Hamilton] and he would get Eldridge's part, it would be settled that way. Anyway, that it had to be, it would be. They were going to meet with their attorneys a day or two after we left here for that all to be settled.'' Upon her return to Oklahoma, Mrs. Fielder told her sisters and her brother James that Oscar ''got'' all of Eldridge's property. During the course of the administration of the estate, no notices of the proceedings were sent to any of the out-of-state relatives who are respondents here by the administrator or the court. Though Oscar corresponded regularly with some of these relatives, he never informed them of the probate proceedings. Oscar visited respondents in Oklahoma in 1949 and 1953 but never mentioned to them the probate proceedings under which Eldridge's property had been distributed to him.

Oscar died in 1954, leaving a will devising and bequeathing his estate to a niece, Frances Fielder, daughter of his half-sister Landon Fielder. Landon was named executrix and

was so appointed after Oscar's will was admitted to probate. About a month after Oscar's death, Mrs. Harkins received a letter from Oscar's aunt, informing her that Eldridge had died intestate and that Oscar had taken over the estate which should have been shared equally by all the brothers and sisters. Mrs. Harkins notified the other respondents and an investigation was undertaken. As a result of such inquiry, respondents filed creditors' claims against Oscar's estate which Mrs. Fielder rejected. Thereafter respondents brought suit against Mrs. Fielder individually and in her capacity as executrix to establish a constructive trust and for damages predicated on fraud. Two separate actions were commenced, one by Krogstad, administrator of Mrs. Bell's estate, and another by the other respondents. The two actions were consolidated for trial. Judgments were rendered in each case for plaintiffs. These judgments are the subject of these appeals.

Appellants contend that the material findings are not supported by any substantial evidence and that the "conclusions of law essential to affirmance of the judgments are not warranted by the application of appropriate rules of law to the undisputed facts."

It is unnecessary for us to set out in detail the various findings made by the court, some of which are specifically expressed and others taking the form of an omnibus statement finding true or untrue particular segments of the complaints and answers. We direct our attention to only those findings essential to support the judgment and those conclusions upon which said judgments ultimately rest. ▮ It is elementary that if a judgment is supported by findings based on substantial evidence, questions relative to the sufficiency of the evidence to support other findings may be disregarded on appeal. (*Logan* v. *Forster,* 114 Cal.App.2d 587, 602 [250 P.2d 730]; *Bohn* v. *Watson,* 130 Cal.App.2d 24, 41 [278 P.2d 454].) ▮ Furthermore, as has been consistently held, a judgment will not be reversed because some conclusions are not legally sound, if the ultimate conclusion upon which the judgment rests is not erroneous in view of the facts found. (*Bohn* v. *Watson, supra,* p. 42.)

So far as is here germane, we epitomize the findings of the trial court, which are that respondents (including the deceased Mrs. Bell), who are Oscar's brother and sisters, were persons of modest means, residing over 1,000 miles from Los Angeles County. They regarded Oscar with affection and

believed that he would deal fairly with them and would refrain from any false act which would impinge upon their rights.

The court found also that the firm of Schweitzer and Schweitzer acted as attorneys for both Lewis and Oscar in all matters connected with the administration of Eldridge's estate and prepared all papers filed with the court relative to the estate. Neither Lewis nor the Schweitzers had any knowledge of Eldridge's kindred other than Oscar before or after the administration of Eldridge's estate until Lewis was informed of respondents' existence at about the time this action was filed. The Schweitzers followed the ordinary course of their business in handling Eldridge's estate, it being their custom and practice to interrogate clients as to other living kindred of a decedent whose estate they handled. Both Lewis and the Schweitzers relied on Oscar to furnish them with information as to Eldridge's kin, but at no time before, during, or after administration did Oscar disclose to them that respondents were a living brother and sisters of Eldridge. Oscar's failure to divulge the existence and relationship of respondents was intentional.

It was found also that the superior court had no knowledge of respondents' existence or relationship to Eldridge and relied upon Oscar's written nomination in appointing Lewis administrator. That in each instance when Oscar stated he was the sole heir at law of Eldridge, his statement was false, and he had adequate assistance to determine the truth or falsity of said statement. During and after administration Oscar intended to obtain distribution of the estate to himself, to the exclusion of plaintiffs. Finally, the court found respondents were not barred by laches or limitations from asserting their claims, in view of the finding that respondents did not learn until October, 1954, that Oscar had caused Eldridge's estate to be distributed to himself.

In its conclusions of law, the court determined, *inter alia,* (1) that Oscar breached his duty to disclose to the superior court, to his attorneys, and to his nominee, the existence of respondents; (2) that Oscar breached a duty to respondents of refraining from any conduct preventing the communication to them of their interest in Eldridge's estate, and (3) that these breaches of duty amounted to a fraud by which Oscar was unjustly enriched.

It is now settled that where a decree of distribution has been procured from the probate court by fraud in matters

outside the issues to be adjudicated—as where the distributee has prevented a party who has an interest in the estate from making an appearance to protect his interest in the estate—equity will intervene to rectify the wrong perpetrated by such extrinsic fraud. (*Purinton* v. *Dyson,* 8 Cal.2d 322 [65 P.2d 777, 113 A.L.R. 1230]; *Caldwell* v. *Taylor,* 218 Cal. 471 [23 P.2d 758, 88 A.L.R. 1194]; *Cardozo* v. *Bank of America,* 116 Cal.App.2d 833 [254 P.2d 949].) While there are many varieties, facets and shadings of extrinsic fraud, a familiar example consists of deceptive conduct on the part of the distributee of an estate which has kept other interested parties away from court by some fraudulent artifice or wilful suppression of material facts. (*Larrabee* v. *Tracy,* 21 Cal.2d 645, 651 [134 P.2d 265]; *Westphal* v. *Westphal,* 20 Cal.2d 393, 397 [126 P.2d 105]; *Bankers Trust Co.* v. *Patton,* 1 Cal.2d 172, 175 [33 P.2d 1019]; *Duffy* v. *Duffy,* 82 Cal.App.2d 203, 207 [186 P.2d 61].) ■ The invocation of equity on the grounds of extrinsic fraud is warranted where an heir or legatee fails to notify the court of the existence of other heirs of whose existence he has knowledge and files false petitions with the court representing there are no such heirs. (*Purinton* v. *Dyson, supra,* p. 326; *Cardozo* v. *Bank of America,* 116 Cal.App.2d 833, 837 [254 P.2d 949]; *Zaremba* v. *Woods,* 17 Cal.App.2d 309, 316 [61 P.2d 976].) ■ Actual or positive fraud is not required as an element of extrinsic fraud, since a mistake on the part of the distributee which keeps a legatee in ignorance of the true facts or deprives him of fair notice of the probate proceedings constitutes a type of extrinsic fraud. (*Bacon* v. *Bacon,* 150 Cal. 477, 490 [89 P. 317]. See *Wendell* v. *Wendell,* 111 Cal.App.2d 899, 900 [245 P.2d 342]; *Antonsen* v. *Pacific Container Co.,* 48 Cal.App.2d 535, 538 [120 P.2d 148]; *Rogers* v. *Mulkey,* 63 Cal.App.2d 567 [147 P.2d 62]; *Sullivan* v. *Lumsden,* 118 Cal. 664, 668 [50 P. 777].) It has been held in varying factual situations that an extrinsic mistake which has foreclosed a party from presenting his case in court furnishes a ground for equitable intervention. (*Hallett* v. *Slaughter,* 22 Cal.2d 552, 557 [140 P.2d 3]; *Olivera* v. *Grace,* 19 Cal.2d 570, 578 [122 P.2d 564, 140 A.L.R. 1328]; *Boyle* v. *Boyle,* 97 Cal.App. 703, 706 [276 P. 118].) ■ As stated in *Westphal* v. *Westphal, supra*: "Fraud or mistake is extrinsic when it deprives the unsuccessful party of an opportunity to present his case to the court. [Citations.] If an unsuccessful party to an action has been kept in ignorance thereof [citations] or has been prevented

from fully participating therein [citation] there has been no true adversary proceeding, and the judgment is open to attack at any time.''

The instant case is manifestly within the purview of these principles. As found by the court, Oscar failed to inform his attorneys, Schweitzer and Schweitzer, of the existence of respondents. That they were his attorneys admits of no doubt. Oscar consulted with them with respect to the initiation of probate proceedings and they prepared for him a ''Nomination of Administrator,'' which he signed. That document was filed in the superior court in connection with Lewis' petition for appointment as administrator as Oscar's nominee. In that document he was listed as the sole heir at law. ▮▮ There was evidence that it was the custom and practice of Schweitzer and Schweitzer to interrogate clients about other living kindred of the deceased person. The court was entitled to find, as it did, that the Schweitzers followed the ordinary course of their business procedure during their consultation with Oscar. (Code Civ. Proc., § 1963; *Hallett* v. *Slaughter, supra,* pp. 555-556.) From the fact that no mention of respondents appeared in that document, the court could reasonably find that Oscar failed to divulge their existence to the Schweitzers.

▮▮ Such concealment was a fraud upon the court and upon respondents (*Wells* v. *Zenz,* 83 Cal.App. 137, 142 [256 P. 484] ; *Guardianship of Levy,* 137 Cal.App.2d 237, 245 [290 P.2d 320]), and having the effect of depriving respondents of notice of the hearing, constituted a species of extrinsic fraud. ▮▮ Fraud, like any other fact, may be inferred from circumstantial evidence. (*Palmquist* v. *Mercer,* 43 Cal.2d 92, 100 [272 P.2d 26] ; *McNulty* v. *Copp,* 91 Cal.App.2d 484, 491 [205 P.2d 438] ; *Bohn* v. *Watson,* 130 Cal.App.2d 24, 33-34 [278 P.2d 454].) ▮▮ The court was entitled to assume that, as attorneys at law and as officers of the court, the Schweitzers would have regularly performed their offcial duties (Code Civ. Proc., § 1963, subd. 15) and would not have failed to apprise the probate court of the existence of other heirs at law had they been in possession of such information. ▮▮ Our statutes ''expressly provide that the suppression of a fact by one who gives information of other facts likely to mislead for want of communication of the fact concealed is deceit (Civ. Code, § 1710), and any other act fitted to deceive is actual fraud. (Civ. Code, § 1572.)'' (*Wells* v. *Zenz, supra,* p. 140.)

This same type of nondisclosure is brought out with equal force in connection with Lewis' petition for letters of administration. Lewis had no knowledge of respondents' existence.

As Oscar's nominee, he was obliged to rely either on Oscar for such information or on the facts incorporated in the various documents prepared in the course of administration, by the Schweitzers, who possessed only such information as Oscar chose to give them. Oscar never informed Lewis at any time that other brothers and sisters existed. By thus concealing and suppressing both from his attorneys and from his nominee, Lewis, that respondents were also a surviving brother and sisters, Oscar effectively prevented them from receiving the notices that otherwise would have been sent them. Even where a fiduciary relationship is absent, one who speaks is not only obligated to tell the truth but he is equally bound not to suppress or conceal any facts within his knowledge which materially qualify those stated. (*Gillespie* v. *Ormsby,* 126 Cal.App.2d 513, 527 [272 P.2d 949].) Since Oscar's conduct resulted in keeping respondents from the probate proceedings, regardless of whether it was done with intent to defraud or was the result of mistake as to the rights of respondents to succeed to Eldridge's estate, there was present that element of extrinsic fraud which entitled respondents to relief from the effect of the decree of distribution. (*Bacon* v. *Bacon,* 150 Cal. 477 [89 P. 317] ; *Cardozo* v. *Bank of America,* 116 Cal.App.2d 833 [254 P.2d 949] ; *Purinton* v. *Dyson,* 8 Cal.2d 322 [65 P.2d 777, 113 A.L.R. 1230] ; *Wendell* v. *Wendell,* 111 Cal.App.2d 899, 900 [245 P.2d 342].) The effect of Oscar's failure to disclose was to perpetuate the fiction in the superior court, which was carried into the decree of distribution, that he was the sole heir at law. As stated in *Purinton* v. *Dyson, supra,* (p. 326): ''It is true that in most cases of extrinsic fraud the defendant has said something directly to the person whose rights were involved amounting to representations that it was not necessary for such person to take any part in the proceedings. In other cases, acts have been held to amount to such representations. But the rule allowing the maintenance of an action in equity for extrinsic fraud should not be limited so strictly as to require as a basis evidence of representations made directly to the one defrauded.''

Evaluated in the light of the evidence and the reasonable inferences therefrom the record is clear (1) that Oscar concealed from the Schweitzers, from Lewis, and from the court the fact of the existence of other heirs; (2) that by such concealment he prevented respondents from receiving notification of the probate proceedings and deprived them of the opportunity to appear in court and assert their claims to Eldridge's

estate; (3) that Oscar was unjustly enriched at respondents' expense by virtue of conduct prejudicial to their interests; and (4) that Oscar's concealment or suppression of the facts, whether induced by fraud or mistake, was extrinsic in nature and cognizable in an independent suit in equity. The cases previously cited, which need not here be repeated, authorize the relief granted respondents under such circumstances. Appellants' argument on the evidence in their briefs amounts to no more than a claim that the trial court drew erroneous inferences from the testimony. But viewing the evidence in the light most beneficial to the prevailing parties, the evidence supports the conclusion that Oscar misled the probate court and by extrinsic fraud or mistake effectively prevented respondents from protecting their interests in the estate of their brother.

Appellants' final point is that the instant action is barred by the statute of limitations. (Code Civ. Proc., § 338, subd. 4.) It is argued that respondents knew of Eldridge's death and that his property was being transferred to Oscar and were thus put on inquiry regarding the probate proceedings as the means by which Oscar was acquiring the property. ▮ The fact that an investigation would have revealed the fraud sooner will not alone bar recovery. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 437-438 [159 P.2d 958]; *Schaefer* v. *Berinstein*, 140 Cal.App.2d 278, 294 [295 P.2d 113].) A party's right to proceed on the theory of fraud is not destroyed merely because opportunities for examination or means of knowledge were open to him where no legal duty devolved upon him to employ such means of knowledge. (*Teague* v. *Hall*, 171 Cal. 668, 671 [154 P. 851]; *Stevens* v. *Marco*, 147 Cal.App.2d 357 [305 P.2d 669]; *Blackman* v. *Howes*, 82 Cal.App.2d 275, 279 [185 P.2d 1019, 174 A.L.R. 1004].) ▮ Where there is an improper concealment of facts at the time of the transaction and thereafter which causes a party to forego an investigation, the statute of limitations does not commence to run until he discovers the fraud thereby worked upon him. (*Neet* v. *Holmes*, 25 Cal.2d 447, 468 [154 P.2d 854]; *South* v. *Wishard*, 146 Cal.App.2d 276 [303 P.2d 805].) ▮ Where by reason of representations made to a defrauded party he is dissuaded from making inquiry, he is not charged with constructive notice of the contents of public records. (*Dabney* v. *Philleo*, 38 Cal.2d 60, 66 [237 P.2d 648]; *Schaefer* v. *Berinstein*, *supra*, p. 296; *South* v. *Wishard*, *supra*, p. 286.) It has been shown that respondents reside 1,000 miles from Califor-

nia; that Oscar misrepresented and concealed the true facts and caused them to believe he was entitled to receive Eldridge's property; that respondents had no reason to doubt this and had no knowledge of facts or circumstances likely to arouse their suspicion until late in 1954; that they filed suit promptly upon discovery of the true facts concerning Oscar's extrinsic fraud or mistake. From the evidence, we cannot hold as a matter of law that any of the circumstances known to respondents should have put a reasonably prudent person on inquiry at an earlier time.　　It was a question for the trier of fact to determine whether respondents' delay in the investigation and discovery of the true facts was reasonable and excusable. (*Neet* v. *Holmes, supra,* p. 468; *Schaefer* v. *Berinstein, supra,* p. 294; *Hallett* v. *Slaughter,* 22 Cal.2d 552, 557 [140 P.2d 3]; *Soule* v. *Bacon,* 150 Cal. 495, 497-498 [89 P. 324].) As stated in the Soule case, *supra*: "At most, it was a question of fact for the court below to determine whether or not the lack of vigilance on the part of the plaintiff was such as would not have occurred with a man of ordinary care and prudence, under the same circumstances. That court has decided the question in favor of the plaintiff, and we are satisfied with its conclusion."

The judgments are affirmed.

Moore, P. J., and Ashburn, J., concurred.