[Civ. No. 40915. Second Dist., Div. Five. Feb. 15, 1974.]

SOTIRIOS ALEXANDROU, Plaintiff and Respondent, v.
THEODORE M. ALEXANDER et al., Defendants and Appellants.

SOPHIA ZETSA et al., Plaintiffs and Respondents, v.
THEODORE M. ALEXANDER et al., Defendants and Appellants.

**COUNSEL**

Theodore M. Alexander, in pro. per., Dillavou & Webb and C. C. Dillavou for Defendants and Appellants.

Evelle J. Younger, Attorney General, Lawrence R. Tapper and Geoffrey S. Cantrell, Deputy Attorneys General, and James E. Satt for Plaintiffs and Respondents.

**OPINION**

**HASTINGS, J.—**

### FACTS

On June 2, 1958, Nicholas S. Alexander (Nicholas) died intestate in Los Angeles County, California. On June 27, 1958, Theodore M. Alexander (Theodore) was issued letters of administration in decedent's estate in the superior court for said county. In the petition for letters of administration signed and filed by Theodore, he listed himself as "adult son."

He also listed Dr. Sotirios Alexandrou (Alexandrou) as "adult nephew." However, he stated in the petition that he, Theodore, was the sole heir and entitled to all of the estate of Nicholas. On October 16, 1959, the probate court made an order settling the final account of Theodore and ordered all of the estate distributed to him. On January 12, 1960, the court signed the order of final discharge of the administrator, Theodore, and exonerated his surety, St. Paul Fire and Marine Insurance Company (St. Paul Ins.). No appeal was taken from those orders of the probate court.

On May 3, 1963, Alexandrou filed in the Los Angeles Superior Court a complaint alleging fraud on behalf of Theodore and seeking to impress a trust on the property distributed by the decree of distribution to Theodore. In addition to naming Theodore as a defendant, the complaint also named his wife, Mrs. Theodore Alexander (on the theory that some of the property had been transferred to her), and St. Paul Ins. for the amount of the bond. Shortly thereafter, a similar action was filed in the same court by five other persons claiming to be heirs of decedent, and subsequent thereto the State of California joined as a plaintiff to protect the potential interests of nonresident alien heirs. The two actions were consolidated for trial. There was a great deal of legal maneuvering which delayed the trial on the merits, but finally, on February 18, 1972, the court signed the judgment that is appealed herein.

The defense to the action, as set forth in the answers by all of the defendants, was that Theodore was in fact the "equitable adopted son"[1] of Nicholas, and the case was tried on this theory. The case was tried before a judge who found that Theodore was only the stepson of Nicholas and rendered a personal judgment against Theodore for $206,312.72 (no trust was impressed on any assets) and a judgment against St. Paul Ins. in the amount of $45,000, the amount of the penal bond filed by the administrator, and a limited judgment against Mrs. Alexander that is not important to this appeal. Both Theodore and St. Paul Ins. appeal. Because the issues on appeal differ, we treat each separately.

## APPEAL OF ST. PAUL INS.

St. Paul Ins. raises three issues on appeal: (1) the action could not be maintained against it until there had been a final court order surcharging the administrator; (2) the order exonerating the surety is res judicata against a claim for fraud against the administrator, and (3) it is liable only in the event Theodore committed acts of malfeasance in his official ca-

---

[1] A term used by Theodore as a person who occupies in equity the equitable status of an adopted son.

pacity as an officer of the court. We first address ourselves to contentions (1) and (3).

(1) St. Paul Ins. maintains that an action against a surety on a probate bond cannot be commenced until there has been a prior order of court fixing the liability of the administrator. (*Nickals* v. *Stanley,* 146 Cal. 724, 726 [81 P. 117]; *Graff* v. *Mesmer,* 52 Cal. 636 [Guardian's Bond]; *Estate of Dwyer,* 168 Cal.App.2d 264, 268 [335 P.2d 718]; *Burns* v. *Massachusetts etc. Ins. Co.,* 62 Cal.App.2d 972, 977 [146 P.2d 29].)

This is correct as a general rule because the liability of the administrator is not known until there has been a full accounting and a surcharge ordered, or some other factual determination that is contained in the court order that delineates the bonding company's liability. A brief review of the cited cases illustrates typical situations. In *Nickals,* the administrator received life insurance monies that were not an asset of the estate; thus as to those monies he was merely a trustee for the wife and not acting as administrator. The wife sued the bonding company before this was determined. In *Graff,* the guardian's letters were revoked and action was commenced before the final account was settled. In *Estate of Dwyer,* the administratrix was removed because of illness. She had commingled funds of the estate with withholding and FICA taxes withheld from wages of her employees. The probate court had approved her final account without surcharge, thus the Court of Appeal reversed and a new hearing was ordered. The court stated that the surety is not liable until the order or decree of the probate court becomes final. *Burns* involved a trial court order that a guardian had misappropriated approximately $12,000 of the ward's funds. Appeals were taken, and the order did not become final until almost three years later. The appellate court held that the surety first became liable to pay on the date the order was final, and interest in excess of the penalty of the bond commenced on that date.

It is recognized that there are exceptions to the above stated general rule based on special circumstances (see 119 A.L.R. 90); examples: death of administrator or guardian before final accounting (*Wegner* v. *Wiltsie,* 3 Ohio C.C.N.S. 410 [23 Ohio C.C. 302]); removal of guardian or administrator (*Wann, et al.* v. *The People, use, etc.,* 57 Ill. 202; *Fassbender* v. *American Surety Co.,* 66 Misc. 6 [122 N.Y.S. 442]); amount susceptible of ascertainment without an accounting (*Center* v. *Finch* (N.Y.) 22 Hun. 146; *Miller* v. *Kelsey,* 100 Me. 103 [60 A. 717].)

We conclude that this case is an exception to the general rule, or at least the facts justify relaxation of it. Here, a final account was filed,

the decree of distribution became final, the administrator was discharged and his bond was exonerated. From an accounting standpoint, nothing further could be accomplished because the gravamen of the action against Theodore was that he wrongfully took *all* of the estate under the guise of being the adult son, when in fact he was a stepson, and under the laws of intestacy was not entitled to any of the assets. If the court found this to be true, the amount owed to the heirs and wrongfully distributed by Theodore had been fully determined by the accounting and decree of distribution. The action was in equity directly attacking the decree on extrinsic fraud. In *Zurfluh* v. *Smith,* 135 Cal. 644 [67 P. 1089], a guardian died before rendering a final account. The ward brought an action in equity to have the account settled and then for a judgment against the sureties for the sum that might be found due the plaintiff upon such settlement. The court said at pages 647-648: "The . . . contention is correct, as a rule of law, as to the proposition that the account must be settled before a judgment can be rendered against the sureties on the bond. The liability of the surety depends upon the liability of the principal, and in case of a deceased guardian or administrator, where there is an administrator of such deceased, the account must be settled and allowed as a basis for the liability of the surety. The *status* of the account must be fixed and determined. . . .

"Appellants contend that, as a prerequisite, a suit should first have been brought in a court of equity to settle and determine the account. That then, after such account was determined, the plaintiff could have maintained a suit upon the bond in a court of law. This logic would lead to the result that the sureties could have been reached by two suits, but cannot be by one. We think the one suit is all that was necessary. The court could, and did, determine the *status* of the account, and then did adjudge that appellants, who signed the bond, were liable. It matters not that part of the relief was equitable and part of it legal, nor under which head it may be placed. The result of the one suit is the same as the result of two would have been. All parties were before the court,—the ward, the administrator of the deceased guardian, and the sureties upon his bond. No piecemeal litigation was required. The court, having jurisdiction of the subject-matter, and of all the interested parties, did then and there determine the whole matter. This was the proper practice." (Italics in original.)

St. Paul Ins. states that *Zurfluh* stands alone, having been decided back in 1902, long prior to the leading case of *Nickals,* decided in 1905. We concede that in a typical case, where the action is brought against the surety *before* the final account and order, *Nickals* would prevail. How-

ever, there is wisdom and a pragmatic approach in *Zurfluh* that is persuasive to this case. Under the theory of the case at bench, no further accounting was necessary. If plaintiffs prevailed, and the bond covered this type of fraud (discussed *infra*), the liability of the bonding company was instantly resolved. The logic of *Zurfluh* is extremely appropriate. Only one lawsuit was required, instead of two, thus eliminating piecemeal litigation. All necessary parties were before the court, which could, and did, determine if Theodore misrepresented his right to inherit, and then adjudged that St. Paul Ins. was liable on its bond. The court having jurisdiction did then and there decide the entire matter.

(2) ■ We turn to St. Paul Ins.' third argument, that it is liable only in the event Theodore committed acts of malfeasance in his official capacity as an officer of the court; that Theodore was acting in his individual capacity and not as administrator. Proof of this, St. Paul Ins. claims, is found in the complaint, where Theodore was not named as administrator but was sued only in his individual capacity.

On this point our response is brief. Theodore had been discharged as administrator. Naming him in the complaint in that capacity would not have been technically correct. The complaint alleges that the acts complained of were performed when he was administrator. Theodore, in his answer, admitted he was issued letters of administration and took the oath to faithfully perform the duties of administrator. St. Paul Ins. also admitted in its answer that it had obligated itself by its bond. ■ The nature and character of a pleading are determined from the allegations. The court is not limited to plaintiffs' theory, but instead must determine if the factual allegations of the complaint are adequate to state a cause of action under any legal theory. (*Barquis* v. *Merchants Collection Assn.*, 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817]; *McDonald* v. *Filice*, 252 Cal.App.2d 613, 622 [60 Cal.Rptr. 832].) Thus, plaintiffs, by not suing Theodore as administrator, were not alleging he was only acting in his individual capacity in connection with the alleged wrongful acts. The allegations of the complaint negate this.

■ The next question, to wit: whether Theodore performed the acts, that deprived the heirs of their inheritance, in his individual capacity or as administrator, is more substantial. We have found no California case directly in point. A very similar case is *Weyant* v. *Utah Savings & Trust Co.*, 54 Utah 181 [182 P. 189, 9 A.L.R. 1119]. Harvey Weyant (decedent) died intestate in Utah. He had lived in that state for 20 years with Rosella McIntyre. They were not married, but lived as husband and wife under the names of Harvey and Rosella Fuller. Harvey had a legal wife

and children in Massachusetts, who did not know where he lived. He died intestate, and Rosella was appointed administratrix, alleging she was his wife and sole heir. The entire estate was distributed to Rosella, she was discharged as administratrix, and the bond was exonerated. Five years after decedent's death, the lawful wife learned of his death in Utah. She sued Rosella, recovered judgment, and then sued the surety. The court held that the surety on the bond of an administratrix is answerable for loss caused to nonresident heirs by the fraud of the administratrix in falsely representing herself to be next of kin, and publishing notice of probate in a fictitious name, and securing a decree enabling her to appropriate the estate to her own use.

Theodore similarly violated his duties and oath as administrator. He falsely represented he was the son and sole heir, and entitled to letters of administration. He did not attempt to determine who the natural heirs were or their addresses so that they could receive notice of the administration of the estate.[2] He prepared and signed the final account and petition for distribution, alleging he was sole heir, thus appropriating all of the assets.

(3) ▮ The order of the probate court settling the final account of Theodore and exonerating the surety is not res judicata as to the claim for fraud against the administrator. St. Paul Ins. cites *Carr* v. *Bank of America etc. Assn.*, 11 Cal.2d 366, 371 [79 P.2d 1096, 116 A.L.R. 1282], as supporting this conclusion. A reading of the case reveals that the fraud involved therein (if any) was intrinsic, and therefore is not precedent here. In *Zaremba* v. *Woods,* 17 Cal.App.2d 309, 318-319 [61 P.2d 976], the court states that extrinsic fraud consists in the deception practiced by

---

[2]He did list plaintiff Alexandrou as "adult nephew" with his address in Greece. He did not list an adult niece living in Hamilton, Ohio, that he had visited with many years earlier. In total, there were one sister and six nieces and nephews. Two letters from Theodore to Alexandrou were as follows:

"July 31, 1958. . . . I had of course assumed that my father had disclosed his family relations to you people in the Old Country, and surely felt certain that your sister in Hamilton, Ohio, with whom my father and I visited many years ago had written that my father had a son who would carry on the family name. . . ."

"30 December, 1959. Dear Doctor, [¶] Please accept my hearty thanks for your best wishes for a happy Yule season and the new year. May you and your family enjoy a most prosperous and happy new year. [¶] The answers to the questions required, so that the property in which my deceased father held in Greece shall be distributed to you and your family are as follows: [¶] My father at time of his death was a citizen of the United States by naturalization and at the time of his passing was a citizen of the State of California. My father died, leaving no will and under California law we are heirs of his estate in California. Therefore we waive any interest we may have in the property in Greece and it shall be distributed to you and your family. [¶] Again my very best wishes. Theodore M. Alexander."

the successful party in keeping his opponent in ignorance of the proceeding.[3] (Theodore succeeded in this during the probate proceedings.) Where extrinsic fraud is shown to exist, the successful party may be held a trustee for those entitled to the estate property. While the judgment or decree of the probate court is not set aside, the distribution of the property may be ordered made to those legally entitled thereto. And in *Weyant, supra,* the court explained that the judgment against the administratrix was directly based on extrinsic fraud practiced by her, which fraud constituted a breach of the bond. Thus, the surety is required to bear the consequences of the administratrix' fraud and has no immunity not accorded to the administratrix.

■ We have discussed the merits of St. Paul Ins.' contentions because of their substantive importance. There is, however, another fatal flaw to its appeal: It joined with Theodore in his defense and chose to defend the case on his right to inherit the total estate. In its answer, St. Paul Ins. denied any wrongdoing on Theodore's part and appeared in the case with Theodore's attorney acting also on its behalf. Not one of the contentions raised on appeal was pleaded nor raised during trial.

All three contentions of St. Paul Ins. are new matter. It did not plead as a defense the requirement of any condition precedent (Contention 1), limitation, exoneration or similar defense (Contentions 2 and 3). Such matters are affirmative defenses in an action against a surety and are not available unless pleaded (*Standard Oil Co.* v. *Houser,* 101 Cal.App.2d 480, 488 [225 P.2d 539]; 46 Cal.Jur.2d, Suretyship and Guaranty, § 62, p. 309.) It is a general rule that an issue not presented by the pleadings cannot be considered on appeal. (*People* ex rel. *City of Torrance* v. *City of Gardena,* 192 Cal.App.2d 686, 691-692 [13 Cal.Rptr. 742]; *Munfrey* v. *Cleary,* 75 Cal.App.2d 779, 784 [171 P.2d 750].)[4]

St. Paul Ins. admitted that it issued and filed in the estate its surety bond in the amount of $45,000, guaranteeing that Theodore would faithfully execute his duties according to law. It then bound itself primarily to the issue of whether Theodore was an equitable son and staked the outcome of its liability on prevailing with Theodore on this issue. It did join with Theodore in affirmatively pleading that the action was barred under Code of Civil Procedure sections 338, subdivision 4, requiring a complaint to be filed within three years after the fraud is discovered, and 343, re-

---

[3]Theodore and St. Paul Ins. did not plead as affirmative defenses res judicata or the finality of the probate decree.

[4]St. Paul Ins. did raise Contention 1 for the first time in its objections to the proposed judgment.

quiring commencement of an action within four years when seeking to establish a constructive trust and laches. However, neither appellant claims the trial court erred in denying them relief under said affirmative defenses thus indicating that they recognize plaintiffs' cause of action was a collateral attack on the judgment based on extrinsic fraud.

In its conclusion, St. Paul Ins. argues that the only matter which this particular suit can adjudicate is the right to impress a trust on the estate property, and this it did not do. It cites no authorities and raises it only as a conclusion. The same issue is specifically raised by Theodore in his appeal, and we respond to it in that portion of this opinion.

## APPEAL OF THEODORE

Theodore appears in propria persona and lists several contentions on appeal. However, on analysis, his contentions raise only two substantive issues. They are:

1. The evidence presented at the hearing proved that Theodore was an "equitable adopted son" or "putative son" and therefore entitled to inherit the entire estate under California law.

2. The trial court erred in rendering a money judgment because the complaint alleged a cause of action in equity to impress a trust on the assets distributed in the estate.

## ARGUMENT

1. The substance of the evidence relied upon by Theodore to prove he was an equitable adopted son is as follows: Theodore's mother married Nicholas in 1918. He lived with his mother and stepfather in Ogden, Utah, until they divorced in 1929. He has always used the name Ted Alexander as long as he can remember. His school records show him as Theodore Alexander and Theodore Plumb Alexander. (Plumb was finally dropped.) He does not know if he was adopted by Nicholas and has no recollection of any legal adoption proceedings or any proceeding legally changing his name to Alexander. After the divorce, his mother went to live in Florida, but Theodore attended junior college in Ogden and lived with Nicholas. In the fall of 1929, Theodore attended the University of Utah in Salt Lake City, and while there he lived in a rooming house. He would return periodically to visit Nicholas, and he claims that Nicholas asked him to live with him.

In 1931, Theodore transferred to George Washington University in

Washington, D.C., and, according to him, Nicholas paid his tuition and gave him $50 per month allowance until 1935, when Theodore entered law school and then supported himself. Theodore concedes that he did not see Nicholas from 1931 until he moved to Los Angeles in 1947, except for a few two- to three-week visits in the summer during the period from 1931 to 1935. In 1947, Theodore moved to Burbank, California, which was near Nicholas' residence, and he claims he saw Nicholas frequently until his death in 1958. During this period, Nicholas lent Theodore $7,000 for a down payment on a home, which loan Theodore repaid.

Theodore introduced into evidence a 1930 United States census record showing the residents of Nicholas' apartment as Nicholas and his "adopted son." This information was not given to the census taker by Theodore. Theodore testified that because he was not Greek he undoubtedly referred to Nicholas as his stepfather in the presence of persons of Greek extraction; however, he claims he introduced Nicholas to his own friends as his father. He said Nicholas told him that he would not make a will because he (Theodore) would "take care of everything."

Theodore's son testified that he used to call Nicholas "Grandad."

Evidence to contradict Theodore's contention he was the equitable adopted son and to prove he was merely a stepson is as follows: Mary B. Alexander, Nicholas' wife after Theodore's mother, testified that she married Nicholas in 1942 and they were divorced in 1950; that she knew Nicholas when he lived in her hotel in Ogden, Utah, starting in 1929 or 1930; that they came to California in 1941; that prior to coming to California, Theodore did not live with Nicholas, but she recalled that he visited Nicholas once or twice in the summers for two or three nights at a time. Nicholas told her that Theodore was his former wife's son; he said that Theodore was not adopted and that he never called Theodore "son." She also testified that Nicholas never referred to Theodore's children as his grandchildren, and that he did not give the name Alexander to him. She did recall one occasion when Theodore's wife asked her to talk Nicholas into giving his name to Theodore.

A Eugennia Moore testified that she had known Nicholas since 1915, and that she first saw Theodore after Nicholas' marriage to his mother. She never heard Nicholas call Theodore "son," and Nicholas never told her that he had adopted Theodore. A Catherine Dokos testified she had known Nicholas since 1922, and that he had never stated that Theodore was adopted, nor did she ever hear Nicholas refer to him as his son. A John Bogris testified that he had known Theodore since 1908, and on one

occasion Nicholas told him that Theodore was the child of his wife's prior marriage. Bogris asked Nicholas if he had adopted Theodore, and Nicholas stated that he had not. He further stated that he never referred to Theodore as his son nor to Theodore's children as his grandchildren. He also stated he had tried to get Nicholas to make a will, but Nicholas would not do so. At that time, Nicholas mentioned that Alexandrou was the one he wanted to get the property.

Other evidence to mitigate Theodore's equitable adopted son claim was as follows: Theodore admitted he never had represented to anyone that he was Nicholas' adopted son. He wrote a letter to Alexandrou stating that he "waive[d] any interest . . . in the property [owned by Nicholas] in Greece . . ." although he made no investigation as to the value or extent of the property that Nicholas might have had in Greece.[5] The 1929 divorce decree refers to Theodore as his mother's son by a prior marriage.

All witnesses who had known Nicholas intimately for many years testified that after Nicholas' death Theodore did not inquire of them about Nicholas' heirs, either in this country or in Greece, although he knew, or should have known, they could have supplied this information.

There are no findings of fact and conclusions of law. The trial court in its "Notice of Intended Decision" did make a specific finding that Theodore was nothing more than a stepson of decedent.

■ Theodore does pinpoint several items of evidence that he contends required the trial court to find that he was an equitable adopted son of decedent. First, the 1930 federal census record showing his status as "adopted son" should have been treated as conclusive, and under the laws of intestacy an adopted child is entitled to the same rights as a natural child in California. His reasoning is that the Census Bureau's report, pursuant to an act of Congress, determined that Theodore was the adopted son of Nicholas, and that under the supremacy clause the California court is bound by this determination.

This contention is without merit. Theodore lists no authority for this startling theory. There is no law cited to show how this "raw" piece of statistical material must be accepted as conclusive evidence binding on the court. It is a documentation of hearsay testimony. Without proof that it was a statement by Nicholas (admissible under an exception to the hearsay rule) clearly the trial court could not give it much weight.

---

[5]See footnote 1, *supra*.

Theodore next contends that he was the "equitable adopted son," "de facto son," "putative son," or one *"in loco parentis [sic]"* to Nicholas because of the evidence previously enunciated. He cites *Estate of Radovich,* 48 Cal.2d 116 [308 P.2d 14], standing for the proposition that an equitable son, et al., occupies in equity the same status as an adopted son and is entitled to the same rights. Briefly, the facts were that when George Radovich was 17 years of age, his natural parents entered into an oral agreement with the decedent whereby George was to live with decedent, who promised that he would consider George his son and would adopt him. George lived with decedent from 1934 to 1953, when decedent died. He died intestate without a wife or issue. No formal proceedings had been instituted during decedent's lifetime for the adoption of George. After a hearing the trial court made findings and concluded that George Radovich occupied the equitable status of an adopted son, and by reason thereof was entitled to distribution of all of the estate of decedent. This judgment was concurred in by our Supreme Court. *Radovich* differs from the case at bar in that there was a contract to adopt, or to treat the alleged son as an adopted child. Here, we have no evidence of a contract or of any intention to adopt.

█ After hearing all the evidence, it was a question of fact to be determined by the trial court as to whether Theodore was an equitable adopted son and entitled to be treated as an adopted son for inheritance purposes. Where findings are waived, it is presumed that the court found all the facts necessary to support the judgment. (*Stewart* v. *Langer,* 9 Cal. App.2d 60, 61 [48 P.2d 758]; *Mastrofini* v. *Swanson,* 114 Cal.App.2d Supp. 848, 849-850 [250 P.2d 764].) Conflict in the testimony merely presented an issue of credibility for resolution by the trial court, and there is substantial evidence to uphold the trial court's finding that Theodore was a stepson and not an equitable son, putative son, et al.

2. █ Theodore's final contention is that plaintiff's cause of action to impress a trust on the assets distributed to him is a case in equity, and the court erred in awarding a personal judgment against him for money damages. In essence, the complaint prayed that a trust be imposed on all estate property in the hands of Theodore; that St. Paul Ins. be found liable in the sum of $45,000; that Theodore be ordered to account for all property distributed to him; that a receiver be appointed to protect the interests of plaintiffs in the distributed property; and for such other relief as the court deems proper. The principal assets distributed to Theodore were common stock, listed with the major stock exchanges, a promissory note, improved real property and some cash.

The record indicates that R. E. Allen was appointed receiver to take possession of the real property and promissory note; that he sold the real property and collected a portion of the note and turned all such assets over to the superior court clerk prior to his discharge as receiver. These assets were thus reduced to cash. Other bits and pieces from the record indicate the stocks were mainly disposed of and invested (or lent) by Theodore in a venture or ventures that failed.

The trial judge lived with this case for approximately four years, during which time there were numerous motions, hearings and orders. It is apparent from the record that he fully understood all issues and the problems concerning the status and transmutation of the assets.

There is no merit to St. Paul Ins.' and Theodore's claim that the trial court erred in ordering a money judgment against defendants instead of impressing a trust. We cite for appellants' enlightenment the following: "The matter of determining the appropriate equitable relief to be granted to a beneficiary is generally left to the judgment of the trial court. If the method chosen is in accord with applicable law the trial court's judgment will prevail. [Fn. omitted.] The court, having once acquired jurisdiction, will adjust all the differences between the parties arising from the cause of action in order to do complete justice and prevent further litigation, whether or not the particular relief was requested. [Fn. omitted.]" (49 Cal. Jur.2d, Trusts, § 448, p. 303.)

Clearly, the judgment was consistent with applicable law. In *Austin* v. *Wilcoxson,* 149 Cal. 24 [84 P. 417], the cause of action alleged a trust. Plaintiff claimed that one of her granduncles gave money to another granduncle in trust for her, who then refused to deliver it to her. While the court conceded her complaint was framed in equity, it in substance also sustained a cause of action in assumpsit (for money wrongfully taken and wrongfully withheld). The court concluded that the issues presented by the pleading were triable at law and permits a money judgment when the complaint is for equitable relief. (See also *Ripling* v. *Superior Court,* 112 Cal.App.2d 399 [247 P.2d 117].)

Without findings, it is implicit from the judgment that the trial court determined that Theodore was not entitled to any of the assets of the estate because he had received them as a result of his own wrongdoing. Also, the status of the assets was such that impressing a trust would not do justice. In *Rivero* v. *Thomas,* 86 Cal.App.2d 225, 238 [194 P.2d 533], the court cited favorably 10 California Jurisprudence, section 5, page 462: " 'From the very nature of equity, a wide play is left to the conscience of

the chancellor in formulating his decrees, that justice may be effectually carried out.'" And in *Sears* v. *Rule,* 27 Cal.2d 131 [163 P.2d 443], the action was to impress a trust on assets distributed from an estate. The court impressed a trust on assets remaining in defendant's possession, but also included in the judgment a money award to plaintiffs with respect to property received by defendant but not accounted for. The court said at pages 140-141: "It is, of course, immaterial that the theory upon which the judgment may be affirmed is not identical with that relied upon by plaintiffs or by the trial court, since plaintiffs are required only to plead and prove facts sufficient to justify relief, and the trial court's judgment must be affirmed if the findings, supported by the evidence, are sufficient to warrant the relief granted on any legal theory."

Based upon the facts of this case, to limit respondents' relief only to the appointment of a trustee over the few remaining assets would be a denial of justice.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.